## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE AT MEMPHIS

**SHELBY ADVOCATES FOR VALID
ELECTIONS; MICHAEL KERNELL;
JOE TOWNS, JR., SUHKARA A. YAHWEH;
ANN SCOTT**

> **Plaintiffs and for all Others
> Similarly Situated,**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMAND**

No._____

**TRE HARGETT in his Official
capacity as TENNESSEE SECRETARY
OF STATE; MARK GOINS, in his Official capacity
As the COORDINATOR OF ELECTIONS for the STATE
OF TENNESSEE; THE TENNESSEE ELECTION COMMISSION;
KENT D. YOUNCE, JUDY BLACKBURN,
GREG DUCKETT, DONNA BARRETT, JAMES H. WALLACE,, JR.,
TOM WHEELER, MIKE MCDONALD, in each of their Official Capacity
As a Member of the TENNESSEE ELECTION COMMISSION;
LINDA PHILLIPS, in Her Official Capacity as a Administrator of
the SHELBY COUNTY ELECTION COMMISSION; SHELBY
COUNTY ELECTION COMMISSION and
ROBERT MEYERS, NORMA LESTER, DEE NOLLNER, STEVE STAMSON,
ANTHONY TATE, in each of their Official Capacity as a Board of Commissioner of
the SHELBY COUNTY ELECTION COMMISSION.**

> **Defendants.**

## VERIFIED COMPLAINT FOR DEPRIVATION OF CONSTITUTIONAL RIGHTS, INJUNCTIVE RELIEF AND DECLARATORY RELIEF

Plaintiffs Shelby Advocates for Valid Elections (hereinafter "SAVE"), Michael Kernell,

Joe Towns, Suhkara A. Yahweh ("Yahweh"), Ann Scott (hereinafter collectively the "Individual

Plaintiffs"), for their Verified Complaint for Declaratory and Injunction Relief herein allege as

follows:

1

## I.    INTRODUCTION

1.      This is not an election contest. This is a civil rights action for declaratory and injunctive relief pursuant to 42 U.S. C. 1983, Rules 57 and 65 of the Federal Rules of Civil Procedure, and 28 U.S.C. 2201 and 2002, brought against Tennessee and Shelby County elections officials and agencies who require Shelby County, Tennessee voters who chose to vote at the polls to use digital electronic voting machines ("DREs") as the means to casting their ballot. Because Shelby County's DRE touchscreen voting machines are insecure, lack a voter-verified paper audit capacity, and fail to meet minimum statutory requirements, requiring voters to use those machines violates the voters' constitutional rights to have their votes recorded in a fair, precise, verifiable, and anonymous manner, and to have their votes counted and reported in an accurate, auditable, legal, and transparent process.

2.      The Plaintiffs are aware that early voting will begin for the 2018 November general federal and state elections on October 17, 2018.  They fully encourage each and every citizen to vote, even though the DRE's have serious flaws as further set forth below. The Plaintiffs are seeking emergency temporary and preliminary injunctive relief in order to require needed safeguards to be implemented by state and local election officials to protect the integrity of the vote in these important upcoming elections. They are also seeking preliminary and permanent injunctive relief to present the use of the DRE's in Shelby County at least from December 2018 forward, and that the Court Order elections systems and voting machines be implemented that provide a handwritten ballot and a voter verifiable paper trail at a minimum.

2

## II.    PARTIES

### A. PLAINTIFFS

### 1. Shelby Advocates for Valid Elections

3.    Plaintiff SHELBY ADVOCATES FOR VALID ELECTIONS ("SAVE") is a domestic non-profit corporation organized and existing under the laws of the State of Tennessee, with its principal office located at 111 S. Highland, #160, Memphis, TN 38111. SAVE brings this action on behalf of itself and on behalf of the voters of Memphis and Shelby County, Tennessee. The incorporators of SAVE are Carol J. Chumney, Michael L. Kernell, and Dr. Joseph Weinberg.

4.    SAVE is a membership organization, with a membership that consists of individuals residing in Tennessee.

5.    SAVE's purpose is for research, advocacy, and education to ensure the fundamental right to vote in public elections.

6.    SAVE's purpose includes submitting open records requests to governmental bodies about elections; to report to the public and governmental bodies on vulnerabilities related to public elections; to monitor nationwide developments in election law and technology; to provide speakers for programs to inform and educate the public about voting vulnerabilities; to provide commentary from its leadership to the public through the media, press, and social media platforms; to collaborate with election computer scientists, academics, non-profits, and organizations to advocate for reforms in the public election voting processes; to facilitate through its members, volunteers, and others the monitoring of elections by poll watching, auditing of election results, observation, and education of the public at large, among other things.

7.    SAVE, acting on its own behalf, has organizational standing to bring each of the claims for prospective relief stated herein.

3

8.      SAVE, acting on behalf of its members who are threatened with imminent injury-in-fact, including the Individual Plaintiffs identified herein, also has association standing to bring the claims for prospective relief stated herein.

> **2.      Plaintiff Individuals**

9.      Plaintiff MICHAEL KERNELL (hereinafter "Plaintiff Kernell") is an incorporator and director of SAVE. Plaintiff Kernell is a former Tennessee State Representative (D-93); and also former non-partisan Shelby County School Board Commissioner (Dist. 9). Plaintiff Kernell is a resident of Memphis, Shelby County, Tennessee, and resides at 3583 Allandale, Memphis, TN 38111. Plaintiff Kernell was a candidate for Shelby County School Board Commissioner in the August 2018 election, and voted in said election. Plaintiff Kernell is a Shelby County, Tennessee registered and qualified  voter and intends to vote in each of the upcoming November 2018 state and federal elections, the October 2019 municipal elections, and the August and November 2020 federal and state elections. The November 2018 elections (with early voting commencing on October 17, 2018) include General Elections for the U.S. Senate seat to be vacated by Sen. Bob Corker.

10.     Plaintiff SUHKARA A. YAHWEH ("Yahweh") is a citizen and resident of Shelby County, Tennessee and resides at 838 Walker, #104, Memphis, Shelby County, Tennessee 38116. Yahweh's race is African American (black). Plaintiff Yahweh voted in the August 2018 elections in Shelby County, Tennessee. Plaintiff Yahweh is a Shelby County, Tennessee registered and qualified voter, and intends to vote in each of the upcoming November 2018 state and federal elections, the October 2019 municipal elections, and the August and November 2020 federal and state elections as a Memphis, Shelby County, Tennessee resident.

4

11.     Plaintiff Joe Towns, Jr. is a candidate for re-election to the Tennessee State Representative (D-84), is a citizen and resident of Shelby County, Tennessee and resides at 4528 St. Honore Dr. Memphis, Shelby County, Tennessee 28116.  Plaintiff Towns was on the ballot in August 2018 state primary elections, and will be on the ballot again as the Democratic nominee in the November 2018 elections. Towns voted in the August 2018 elections in Shelby County, Tennessee. Towns is a Shelby County, Tennessee registered and qualified voter, and intends to vote in each of the upcoming November 2018 state and federal elections, the October 2019 municipal elections, and the August and November 2020 federal and state elections as a Memphis, Shelby County, Tennessee resident.

12.     Plaintiff Ann Scott is a citizen and resident of Shelby County, Tennessee and resides at 3535 Faxon, Memphis, Shelby County, Tennessee 38122.  Plaintiff Scott voted in the August 2018 elections in Shelby County, Tennessee. Plaintiff Scott is a Shelby County, Tennessee registered and qualified voter, and intends to vote in each of the upcoming November 2018 state and federal elections, the October 2019 municipal elections, and the August and November 2020 federal and state elections as a Memphis, Shelby County, Tennessee resident.

### B.     DEFENDANTS

### 1.     Defendant Secretary

13.     Defendant TRE HARGETT is sued for prospective declaratory and injunctive relief in his official capacities as the Secretary of State of Tennessee. Defendant HARGETT is hereinafter referred to as "Hargett", or the "Secretary". Hargett is a person within the meaning of 42 U.S.C. 1983 and was acting under color of state law at all times relevant to this Complaint. Service on the Secretary is made by serving Herbert Slatery, III, the Tennessee Attorney General and Reporter, at 301 6th Avenue, N., Nashville, TN 37243.

**2.      Defendants Tennessee Election Commission and State Board Members.**

14.      Together with the Secretary, Defendants Tennessee Election Commission (the

State Board"), and Kent D. Younce, Judy Blackburn, Greg Duckett, Donna Barrett, James H.

Wallace, Jr., Tom Wheeler, and Mike McDonald in their official capacities as members of the

Tennessee Election Commission, are sued for prospective declaratory and injunctive relief

(hereinafter collectively the "State Board members"). Service is made on the State Board and the

State Board members by service on Herbert Slatery, III, the Tennessee Attorney General and

Reporter, at 301 6th Ave., N., Nashville, TN 37243.

**3.      Defendant Coordinator of Elections**

15.      Defendant MARK GOINS is sued for prospective declaratory and injunctive relief in his

official capacities as the Coordinator of Elections for the State of Tennessee. Defendant GOINS

is hereinafter referred to as "Goins", or the "Coordinator of Elections". Coordinator of Elections

Goins is a person within the meaning of 42 U.S.C. 1983 and was acting under color of state law

at all times relevant to this Complaint. Service on the Coordinator of Elections is made by

serving Herbert Slatery, III, the Tennessee Attorney General and Reporter, at 301 6th Avenue, N.,

Nashville, Tennessee 37243.

**4.      Defendants Shelby County Election Commission and Shelby County Election
Commissioners**

16.      Defendants Shelby County Election Commission (hereinafter the "Shelby Board"), and

Robert Meyers, Norma Lester, Dee Nollner, Steve Stamson, Anthony Tate, in their official

capacities as members of the Shelby County Election Commission (hereinafter collectively the

"Shelby Board members"), are sued for prospective declaratory and injunctive relief. The Shelby

Board maintains an office at 150 Washington, 2d Floor, Memphis, TN 38103. Service on the

Shelby County Election Commission and the Shelby County Election Commissioners is made by

6

serving Linda Phillips, Shelby County Election Administrator, 150 Washington, 2d Floor,

Memphis, TN 38103.

    **5.**    **Defendant Shelby County Election Administrator**

17.    Defendant Linda Phillips, is sued for prospective declaratory and injunctive relief in her

official capacity as Administrator of the Shelby County Election Commission (the "Shelby

Administrator"), which maintains an office at 150 Washington, 2d Floor, Memphis, TN 38103.

Shelby Administrator Phillips is a person within the meaning of 42 U.S.C. 1983 and was acting

under color of state law at all times relevant to this Complaint. Service on the Shelby County

Election Commission Administrator is made by serving Linda Phillips, Shelby County Election

Administrator, 150 Washington, 2d Floor, Memphis, TN 38103.

## III. JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over each of the claims raised in this action

pursuant to 28 U.S.C. 1331 (federal question jurisdiction); 1343 (jurisdiction over civil rights

actions), 1367 (supplemental jurisdiction), 2201 (jurisdiction to grant declaratory relief), and

2202 (jurisdiction to grant relief ancillary to declaratory judgment).

19.    Venue lies in the Western District of Tennessee pursuant to 28 U.S.C. 1391(b) because

multiple defendants reside in this judicial district and all defendants are residents of Tennessee

and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in

this judicial district.

20.    This Court has the authority to enter a declaratory judgment and to provide emergency

temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the

Federal Rules of Civil Procedure and 28 U.S.C. 2201 and 2202.

7

## IV. LEGAL FRAMEWORK

### A.  The United States Constitution

21.     The United States Constitution provides: "The time, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof…" U.S. Const. Art. I, Sec. 4, cl. 1.

22.     The *Fourteenth Amendment* to the U.S. Constitution, Sec. 1, states that "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

### B. The Tennessee Constitution

23.     The Tennessee Constitution provides that "the elections shall be free and equal, and the right of suffrage, as hereinafter declared, shall never be denied to any person entitled thereto, except upon conviction by a jury of some infamous crime, previously ascertained and declared by law, and judgment thereon by court of competent jurisdiction". *Tenn. Const. Art. I, Sec. 5.*

24.     The Tennessee Constitution provides that "all power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety, and happiness…" *Tenn. Const. Art. I, Sec. 1.*

25.     The Tennessee Constitution provides that "..the free communication of thoughts and opinions, is one of the invaluable rights or man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty..". *Tenn. Const. Art. I, Sec. 19.*

8

26.     The Tennessee Constitution provides:

> **Sec. 1. Right to vote—Election precincts—Military duty.**
> Every person, being eighteen years of age, being a citizen of the
> United States, being a resident of the State for a period of time
> as prescribed by the General Assembly, and being duly
> registered in the county of residence for a period of time
> prior to the day of any election as prescribed by the General
> Assembly, shall be entitled to vote in all federal, state, and local
> elections held in the county or district in which such person
> resides. All such requirements shall be equal and uniform across
> the state, and there shall be no other qualification attached to
> the right of suffrage.
>
> The General Assembly shall have the power to enact laws requiring
> voters to vote in the election precincts in which they may reside,
> and laws to ensure the freedom of elections and the purity of the ballot
> box.
>                 …

*Tenn. Const. Art. IV, Sec. 1.*

27.     The Tennessee Constitution provides:

> [the] Legislature shall have no power to suspend any general law
> for the benefit of any particular individual, nor to pass any law
> for the benefit of individuals inconsistent with the general laws
> of the land; nor to pass any law granting to any individual or
> individuals, rights, privileges, immunitie[s] or exemptions
> other than such as may be, by the same law extended to any
> member of the community, who may be able to bring himself
> within the provisions of such law.

*Tenn. Const. Art. XI, Sec. 8.*

**C. The Tennessee Election Code**

28.     All elections for public office in the State of Tennessee are conducted according to

Tennessee Code Annotated, Title 2. *Tenn. Code Ann. 2-1-103.*

29.     Under Tenn. Code Ann. 2-1-102:

> **2-1-102. Purpose.**
> The purpose of this title is to regulate the conduct of all elections by the
> people so that:
> (1) The freedom and purity of the ballot are secured;

9

   (2) Voters are required to vote in the election precincts in which they
   reside, except as otherwise expressly permitted;
   (3) Internal improvement is promoted by providing a comprehensive and
   uniform procedure for elections; and
   (4) Maximum participation by all citizens in the electoral process is
   encouraged.

30. The Tennessee Election Commission is a seven member board appointed by the Tennessee General Assembly. *Tenn. Code Ann. 2-11-204(b).*

31. Under Tenn. Code Ann. 2-1-111, "each person charged with the administration of any part of the election laws of this state" must take an oath swearing and affirming that he or she "will support the Constitution and laws of the United States and the Constitution and the laws of the State of Tennessee" and "will faithfully and impartially discharge of the duties" of the office.

32. The Tennessee Secretary of State appoints the Coordinator of Elections, who serves at the pleasure of the secretary of state. *Tenn. Code Ann. 2-11-201 (a).*

33. The Coordinator of Elections is the chief administrative election officer of the state "and shall obtain and maintain uniformity in the application, operation and interpretation of the election code". *Tenn. Code Ann. 2-11-201(b).*

34. The Coordinator of Elections, subject to the concurrence of the secretary of state, may make rules and regulations as necessary to carry out the election code provisions. *Tenn. Code Ann. 2-11-201(c).*

35. The Coordinator of Elections, subject to the concurrence of the secretary of state, may "enter into such contracts for equipment as may be appropriate for the efficient discharge of the duties of the office." *Tenn. Code Ann. 2-11-201(d).*

36. The duties of the Coordinator of Elections includes: (1) general supervision of all elections; (2) advise election commissions, primary boards, and administrators of

10

elections as to the proper methods of performing their duties; (3) authoritatively interpret the decision of election laws for all persons administering them; (4) investigate or have investigated by local authorities the administration of the election laws, including reviewing the county election commission in the administration of election laws, such as voting systems, certification of election results, and election results tabulation process. *Tenn. Code Ann. 2-11-202 (1), (3), (4), (5)(A)(i)(iii).*

37.     The Tennessee Coordinator of Elections and the Tennessee Election Commission must approve any voting machines before a county election commission purchases the machines. *Tenn. Code Ann. 2-9-117.*

38.     As of the 2002 election cycle, and "at least every eight (8) years thereafter, the state coordinator of elections and the state election commission shall reexamine all voting machines to ensure such machines still meet the minimum criteria for certification." *Tenn. Code Ann. 2-9-117.*

39.     The Shelby County Election Commission ("The Shelby Board") is a five member commission appointed by the state election commission, and maintains an office at 150 Washington Ave, 2d Floor, Memphis, TN 38103. *Tenn. Code Ann. 2-12-101 (a).*

40.     The local election commissions are required to appoint an administrator of elections who is the chief administrative officer of the commission "and who shall be responsible for the daily operations of the office and the execution of all elections". *Tenn. Code Ann. 2-12-201.*

41.     The duties of the county election commission include, but are not limited to: (1) appoint the administrator of elections who is responsible for the daily operations of the commission office and the execution of all elections; (2) "upon the recommendation of the administrator" .."approving any voting equipment to be purchased by the county for use by the commission";

11

(3) "certify all voting machines prior to each election" and "canvass all voting machines after each election"; (4) responsible for "certifying the results of each election in regard to official tabulations"... *Tenn. Code Ann. 2-12-116 (1), (3), (10).*

42.     The county election commissioners are charged with setting "the proper ballot labels on the voting machines, and shall have the machines put in proper order for voting with the registering counters set at zero(000), the counting mechanisms locked, and each machine sealed with a pre-numbered seal." *Tenn. Code Ann. 2-9-105(a).* However, any key locks on the voting machines utilized in Shelby County, Tennessee can be easily picked.

43.     The county election commission must mail notices to the chairs of the local county executive committees of the political parties, and to independent candidates, advising as to when and where the voting machines will be examined. They may designate a representative "who may be present to see that the machines are properly prepared for use in the election". *Tenn. Code Ann. 2-9-105 (b).*

44.     The local election commission, or its designee(s), as soon as practical after the election "compare the votes from the tally tapes of all appropriate sources to the tabulated election results". *Tenn. Code Ann. 2-8-104.* "All candidates, their representatives, representatives of political parties, and representatives of the press may be present during the process and shall be given ample opportunity to examine the tabulations." *Tenn. Code Ann. 2-8-104.*

45.     Tenn. Code Ann. 2-9-104, provides for police protection against tampering with or injury to the voting machines to be provided by local authorities after they have been prepared for and during an election.

46.     For county election commissions using electronic voting machines for early voting, the "commission shall remove the vote totals according to rules promulgated by the coordinator of

elections". *Tenn. Code Ann. 2-6-304 (e)*. Notice must be provided to all candidates and political

parties "of the place and time when the vote totals will be removed from those voting machines".

*Tenn. Code Ann. 2-6-304 (e)*. "In no event may the votes for any candidate be totaled until after

all polls in the county are closed". *Tenn. Code Ann. 2-6-304(e); State Rules, 1360-02-13-.28,*

*"Early Voting Inspections for Electronic Machines-Election Commission Pre-Inspection".*

47.     In an election contest by a party as to the accuracy of the voting machines or the accuracy

of the recording of the vote on the machines, the party may have the "machine or machines

brought into the court to be examined by the parties or as evidence". *Tenn. Code Ann. 2-17-110.*

48.     Any election contest must be filed within five (5) days after certification of the election.

*Tenn. Code Ann. 2-17-105.*

49.  In 2008, the Tennessee General Assembly passed the Tennessee Voter Confidence Act

mandating the use of precinct-based optical scanner voting systems—which scan and count

voter-verified paper ballots[1]—on or before the November 2010 general election. *Public Chapter*

*1008, Acts of 2008.* After being scanned and counted, the paper ballots are securely stored, which

provides a voter-verified paper audit trail (VVPAT).

50.     The Tennessee Voter Confidence Act was amended in 2010 to delay implementation

until no later than the 2012 general election. *Public Chapter 612, Acts of 2010.*

51.     In 2011, the Tennessee Voter Confidence Act was amended to authorize, rather than

require counties to use precinct-based optical scanners. *Public Chapter 301, Acts of 2011.*

Counties that use precinct-based optical scanners are required to conduct automatic audits of

randomly selected voter-verified paper ballots cast in certain elections. *Tenn. Code Ann. 2-20-*

---

[1] See Tenn. Code Ann. 2-10-101 for definitions of "precinct-based optical scanner" and "voter-verified paper
ballot".

13

*101.* The amended law states that "every effort shall be made to purchase United States manufactured precinct-based optical scanner voting systems". *Tenn. Code Ann. 2-20-106.*

52.   Currently 14 counties in the State of Tennessee utilize voting equipment that produces a VVPAT.[2] Exb. "A".

53.   Two bills were introduced in the Tennessee General Assembly in 2018, but not passed, that would have required voter-verified paper ballots in Tennessee.[3]

54. According to the Tennessee Governmental Advisory Commission, Tennessee requires testing to the federal standards set by the US Election Assistance Commission (EAC). [4] However, the voting machines and systems in use in Shelby County, Tennessee are not identified as certified systems on the current EAC website[5].

55.   Studies have shown that the use of optical scan machines is less expensive in that only one optical scan machine is needed per precinct instead of the multiple machines used with the DREs with the paperless electronic touch screen voting system. Monies are saved in that less machines are needed to be programed, serviced, tested, stored and transported. [6]

### D.   Tennessee's Regulation of Elections

56.   The Secretary of State's Electronic Voting Machine Rules and Regulations (hereinafter "the State Rules"), state their intent as to (a) ensure that the "freedom and purity of the ballot is safeguarded"; (b) permit the county election commissions "with the approval of the Coordinator of Elections and the State Election Commission, to use alternative electoral devices"; (c) ensure

---

[2] Tennessee Advisory Commission on Intergovernmental Relations, "Election Study Update-Preliminary Information", 9/6/18. (copy attached as Exhibit "A").
[3] Exhibit "A"; *Senate Bill 2438 by Yarbro and House Bill 2567 by Stewart,; Senate Bill 2090 by Niceley and House Bill 2300 by Beck.*
[4] Exhibit "A", pg. 3.
[5] www.://www.eac.gov/voting-equipment/certified-voting-systems/
[6] PEW, "Aging Voting Machines Cost Local, State Governments", Mar. 2, 2016; http://www.votersunite.org/info/costcomparison.asp.

"each voter's vote will be accurately and honestly counted"; (d) establish a "uniform procedure for the use of an electronic system of voting will be in use throughout the State of Tennessee"; and (e) ensure that the "total of votes cast will accurately reflect the will of the majority of voters voting in any given election". *State Rules, 1360-02-13-.02 "Intent of Regulations".*

57.     Under the State Rules, "no voting devices using electronic computers for the tabulations of the results of any election shall be certified in the State of Tennessee unless such computers may be programmed to".. "(d) accurately report the results of each such primary and general election individually". *State Rules, 1360-2-13-.07(d) "Certification of Voting Machines Using Computers to Tally Votes".*

58.     Under the State Rules, the certification for any county "may be withdrawn if, in the opinion of the Coordinator of Elections of the State of Tennessee or in the opinion of the Tennessee State Election Commission, a material violation of "the State Rules has occurred in any election". *State Rules, 1360-02-13.08 "Withdrawal of Certification".*

59.     Under the State Rules, no county election commission or county governing body may purchase any electronic voting device that is not certified by the Coordinator of Elections with the approval of the State Board. If such electronic voting device has been certified, the county election commission or county governing body must make application to and obtain approval by the Coordinator of Elections and the State Board prior to purchase. *State Rules, 1360-02-13-.09, "Purchase by Counties".*

60.     Under the State Rules, the county election commission has a duty to investigate the electronic voting systems, and to not purchase any machines until they have been certified by the same. *State Rules, 1360-02-13-.13, "Investigation by County Election Commission".*

15

61.     Under the State Rules, the county election commission must "provide for the use of a computer capable of receiving and tallying all votes cast using electronic voting machines. The commission shall take adequate steps to insure that the program for each election is in its hands, and tested, at least twenty (20) days prior to each such election. " *State Rules, 1360-02-13.17, "Computer Use".*

62.     Under the State Rules, the county election commission must institute safeguards to "completely clear the computer equipment before vote tallying commences"; secure the operating system and the application program; lock out unwarranted actions on the computer and log all actions; physically protect the computer after initial programming; program each memory cartridge to be used in the election and a seal; and "require written certification by appropriate persons that the foregoing actions were properly taken". *State Rules, 1360-02-13-.17 (a)-(e), "Computer Use".* However, it is not possible to completely clear the machines, as malware can remain. Further, under federal and state laws, the Defendants must retain and preserve all records and papers pertaining to voting in federal elections for 22 months, and any clearing of the machines violates those requirements. *52 U.S.C. 20701.* Moreover, voting machines seals are easily broken and replaced within seconds.

63.     Under the State Rules, the memory cartridges and election materials are required to be transported in the company of a member of the other political party to the location designated by the county election commission from the polls. The officials shall travel in the same automobile and "shall not be permitted to stop except as required by law or emergency. At no time shall the memory cartridges and the certification materials be left unattended. " *State Rules, 1360-02-13-.23, "Transporting Memory Cartridges and Remaining Election Materials to County Election Commission"; Tenn. Code Ann. 2-7-138.*

16

64. Under the State Rules, the seals on early voting machines may not be removed until "after the close of polls on election day". *State Rules, 1360-02-13-.31 "Early Voting Election Day Procedures (Closing Polls).* Then, the "cartridge may be removed from the machine and mechanically read and printed to retrieve the votes cast. The paper tape may be removed from the machine and filed with the other early voting documents". *State Rules, 1360-02-13-.31 "Early Voting Election Day Procedures (Closing Polls).* However, there is no way to "mechanically read" the cartridges utilized in Shelby County, Tennessee as further explained below.

## V. GENERAL ALLEGATIONS

### A. The Voting Systems in Use in Shelby County

65.     Shelby County currently uses the following software[7]:

- GEMS Software version 1.18.24.101 produced by Diebold, and rights acquired by ES & S [Election Systems & Software LLC], Election System Manger versions 9.4.004 with RPL version 3.1.019 and RPS version 2/6/002 & Election System Manager version 14.005 with RPL version 14.008, and RPS version 14.001 (all produced by Accenture, software);
- Software on the Flash card reader/duplicator version 2.6.12.2009-401 (unknown as to origin);
- Software on the Electronic Poll Books version 2.7.12.4 (without knowledge as to the origins)
- Software for voter card encoder (without knowledge as to version or manufacturer of this software);
- Software on TSX Voting Machines version 4.6.4.103 produced by Diebold;
- VC Programmer version 4/6/1 produced by Diebold.

   (hereinafter collectively the "Shelby voting systems").

66.     The Shelby Board uses "Election Systems Manager (ESM), a voter registration application that interfaces with the GEMS software for election preparation and set-up, to

---

[7] Halbert v. Shelby County Election Commission, Shelby County Chancery Court, No. No. 15-1448 (2015), SCEC Interrogatory Response, No. 13.

capture pertinent data relative to voter registration and election officials, and as a reporting function for election data. [8]

67.     The GEMS 1-18-.22 was certified by the Tennessee Election Commission on January 11, 2006.[9]  The Diebold RFP Response to the Shelby County Government ["SCG"] dated December 12, 2005 states that the vendor Diebold Elections Systems, Inc. was in the process of applying to the State for certification of the GEMS software version 1.18.24 upgrade.[10]  The Diebold contract with SCG further has a large "X" marked through negating provisions that require that Diebold ensure enhancements and upgrades are fully certified by the State of Tennessee.[11]

68.     On December 1, 2015, the minutes of the Tennessee Election Commission reflect that the Diebold/Premier/ES & S Gems 1-18-.22 was recertified despite the fact that no such system was present in Shelby County. [12] Exb. "B". On July 8, 2013, the Tennessee State Election Commission approved list of voting machines only identified the Diebold/Premier/ES & S Gems 1-18-.22, with no mention of Gems 1-18.24. [13] Exb. "C". The SCEC presently uses GEMS 1-18-.24[14].

69.   In January 2010, the Shelby County Government entered into a license agreement with Accenture LLP to "use the source code for ESM ("Source Code") from Accenture, stating that "the County desire to modify and prepare derivative works based upon the Source Code and

---

[8] Shelby County Government, *"Shelby County Election Commission Internal Control Study",* Internal Audit Report No. 13-011, ov. 4, 2013, pgs. 5-6.
[9] State of Tennessee Division of Elections Approved Voting Systems, Jan. 11, 2006
[10] Diebold Request for Proposal Response to Shelby County Government, pg.3-12/12/05.
[11] The X also marked out the contractual provision requiring SCG to incorporate enhancements and upgrades received from Diebold within ten (10) days.
[12] Tennessee State Election Commission Approved Voting Machines Dec. 1, 2015.
[13] Tennessee State Election Commission Approved Voting Machines- July 8, 2013.
[14] SCEC Interrogatory Response, No. 13, [Halbert v.SCEC Chancery Court lawsuit] March 2016; Newman. Et. al, v. Shelby County Election Commission, et. al, Shelby County Chancery Court, No. 10-1538, Transcript of Dennis Boyce Deposition Sept. 28, 2010 pages, 93:3-5. One IT professional consulted advised that .24 can not be certified now because the Windows platform is obsolete and the most vulnerable now.

otherwise use the Source Code in support of its internal purposes".[15]  It is unknown what modifications have occurred, this is an extraordinary occurrence that opens the door to election security vulnerabilities, and the Tennessee Elections Office has not produced any documents verifying that such modifications were ever certified.

70.     The ESM is no longer supported by the vendor, and instead the Shelby Board has relied upon an independent consultant who resides out of state.[16] In fact, in a 2015 RFQ for Replacement of Election System Management Software, the County states that "the absence of vendor support for the critical and obsolescent software presents an unacceptable risk to the election delivery capability and operation of the election commission." [17]

71.  The Shelby County Election Commission also uses the Accuvote-TSx R7 voting devices (hereinafter "AccuVote DREs"). "Results are stored to both an external PCMCIA memory card as well as internal flash memory". [18]"All election information specific to the vote center, including races, candidates and ballots are programmed onto PCMCIA memory cards from GEMS. The PCMCIA memory card acts as primary storage location for the AccuVote-TSx, with the internal flash memory acting as secondary, backup storage. In the course of voting, all ballots cast are stored on the memory card as well as internal flash drive memory. "[19] "Memory cards and AccuVote-TSx units are interchangeable; the Accuvote-TSx assumes the identity of the

---

[15] According to an email of SCEC Administrator Holden in 2012, Shelby County purchased the source code for its Voter Registration software from Accenture. The system was originally sold by CMIS from Russellville, Arkansas. Shelby, Wilson and Sullivan counties purchased the VR system. The company was then sold to Election.com and later purchased by Accenture. Accenture decided to get out of the elections business due to inconsistent cash flow and excessive litigation. Shelby County then purchased the source code and located support vendors for the VR system in 2000. Accenture LLP License Agreement with Shelby County Government Jan. 25, 2010.
[16]015 RFQ of Shelby County, TN for Replacement of Election Management System [ESM] Software , pg. 3.
[17] , 015 RFQ of Shelby County, TN for Replacement of Election Management System [ESM] Software pg. 3.
[18] Diebold AccuVote TSX Hardware Guide 2007 , [Overview].
[19] Diebold AccuVote TSX Hardware Guide 2007, 2.2.3.

19

currently active election on any installed programmed memory card." [20]Smart cards are used for each voter to record his or her votes on the voting machine.[21]   Experts advise that smart cards can be used to cast as many votes as a holder wants.

72.      After the polls close, the memory cards for each voting machine can be inserted into one machine to accumulate the votes from that precinct.[22] Each voting machine has a "modem" "which may easily be removed from the unit base", and then "connect the telephone jack located within the Ethernet PCMCIA slot on the tablet to a wall phone jack".. for uploading results.[23] Thus, each AccuVote TSx has the capability to be connected to the internet, possibly even with a cell phone. The practice for the SCEC has been for the AccuVote DRE units to be used as an intermediate device for electronic transmission of ballot data collected on TS units from designated Zone Turn-in Sites to the Shelby GEMS server. Memory cards are brought by precinct poll officials to five or six Zone Turn-in Sites on election night. The memory cards can also be brought to the Election Offices for uploading, and tabulation.

73.      The use of the AccuVote DREs makes Tennessee's elections unverifiable, unauditable, and vulnerable to undetectable manipulation. AccuVote DREs create no verifiable record of voter intent, paper ballot or paper verification of the votes cast, unlike optical scanner components that rely on a voter-marked paper ballot as a verifiable official record.

74.      Each AccuVote DRE internally contains much of the same hardware that might typically be found in an inexpensive general-purpose desktop computer in use in the early 2000s.

---

[20] Diebold AccuVote TSX Hardware Guide 2007, 2.2.3
[21] Diebold AccuVote TSX Hardware Guide 2007, 2.2.4.
[22] Diebold AccuVote TSX Hardware Guide 2007, 2.2.5.
[23] Diebold AccuVote TSX Hardware Guide 2007, 2.2.6, 2.2.

20

75.     The software that Shelby's AccuVote DREs run is a Diebold-modified version of Microsoft's Windows CE operating system—which Microsoft stopped supporting in years past. As a consequence, Microsoft is no longer issuing updates or security patches for that software.

76.     The proprietary Ballot Stations (Diebold software application) runs on top of the Windows operating system on AccuVote DREs and provides the user interface that voters and poll workers see. The Ballot Station interacts with the voter, accepts and records votes, and the GEMS software counts the votes recorded on the DRE, and performs all other election-related processing by the DRE.

77.     AccuVote DREs are configured for each election by inserting a memory card into a slot behind a locked door on the side of the machine.

78.     Before the election, the file system on the memory card stores the election definition, sound files, translations for other languages, interpreted code that is used to print reports, and other configuration information.

79.     AccuVote DREs use software installed on the unit to display graphical information to the voter that indicates which part of the touchscreen display corresponds to particular electoral choices.

80.     Voters record their preferences by physically touching the part of the screen that corresponds to the voter's preferred choice.

81.     When operating properly, AccuVote DREs use software installed on the unit to translate the voter's physical act of touching a particular place on the touchscreen into a vote for the corresponding candidate or issue.

82.     When operating properly, AccuVote DREs use software installed on the unit to change what is graphically displayed on the touchscreen to indicate to the voter that a particular electoral choice has been electronically registered by the unit.

83.     When operating properly, AccuVote DREs use software installed on the unit to record the voter's choice on both the DRE's removable memory card and into the machine's internal flash memory. The voters are unable to observe how their vote is recorded.

84.     Shelby County's AccuVote DREs do not record a paper or other independent verifiable record of the voter's selections.

85.     Upon the closing of the polls, poll workers cause AccuVote DREs to interpret collected electronic information and print a paper tape of vote totals recorded on each machine.

86.     After the tape of the DREs machine's vote totals is printed, the removable DRE memory cards are taken from each of the AccuVote DREs and secured for transport either to a Zone Turn-In satellite vote transmission center, or directly to the county election annex offices.

87.     On election night, AccuVote DRE memory cards from polling places are collected and uploaded into the Diebold GEMS server (running on a desktop computer) either via remote transmission from the Zone-Turn In site, via AccuVote DRE machines at the county election annex offices, and/or directly into the Diebold GEMS server (running on a desktop computer) where the GEMS software then combines DRE vote data with data from mail-in absentee ballots.

88.     On Election Day or night, the early voting machines are removed from storage, set up, and memory cards removed from each of the AccuVote DREs used during early voting.

89.     On Election Day or night, the early voting memory cards are uploaded to the Diebold GEMS server (running on a desktop computer) by temporary election workers via approximately

22

twenty AccuVote DRE voting machines set up in a separate part of the county election annex offices.

90.     The GEMS software combines the DRE early vote data with the Election Day DRE data, and consolidated preliminary reports are created called the Unofficial Statement of Votes Cast, and printed.

91.     Mail-in absentee paper ballots and provisional ballots are scanned and tabulated by Diebold AccuVote Optical Scan units, located in the county election annex offices.

92.     The Diebold AccuVote Optical Scan units are programmed with software to scan, count, tabulate and report the paper ballot vote counts.

93.     On election night, Diebold AccuVote Optical Scan unit memory cards are uploaded to the Diebold GEMS server and combined with data from the AccuVote DREs to create unofficial consolidated results and generate reports.

94.     Many of the poll officials and workers, including supervisors, hired by the Shelby County Election Commission are not properly trained in the use of the Shelby voting systems, including voting machines, software, and voting equipment. The training is so reckless or grossly negligent that misconduct was and is almost inevitable or substantially certain to occur.

### B.     AccuVote DREs Are Insecure and Vulnerable to Malicious Hacking

95.     Over the past year, news reports have abounded that paperless balloting is unreliable, insecure, and unverifiable because it can not be audited.

96.     In January 2017, the U.S. Department of Homeland Security (DHS) designated elections as "critical infrastructure" to more formally make election infrastructure "a priority for

23

cybersecurity assistance and protections" and allow DHS to provide cybersecurity assistance to state and local election officials who request the same. [24]

97.     In the fall of 2017, the State of Virginia decertified all DRE touchscreen voting machines requiring 23 cities and counties to purchase new voting machines only weeks before the November 2017 elections.[25]

98.     The DHS also launched its Elections Infrastructure Information Sharing and Analysis Center (EI-ISAC) in March 2018, which provides elections-focused cyber defense assistance to state and local elections offices nationwide. [26] In 2018, the DHS announced that it provides at no cost to the state and local government and officials who request the following: cybersecurity assessments, such as cyber hygiene scanning, risk and vulnerability assessment, and cyber resilience reviews, cyber threat hunting and enhanced cyber services, 24/7 incident response, cybersecurity training among other services. [27]

99.     In January 2018, the Congressional Task Force on Election Security issued a Final Report addressing the insecurity of the voting infrastructure in the United States. The Final Report stated:

> Given the breadth of security risks facing voting machines it is especially problematic that approximately 20% of voters are casting their ballots on machines that do not have any paper backup. These voters are using paperless Direct Recording Electronic (DRE) machines that have been shown over and again to be highly vulnerable to attack. Because these machines record votes on the internal memory of the machine, and do not leave any paper backup, it is near impossible to detect whether results have been tampered with.[28]

---

[24] Exhibit "A" pg. 7.
[25] https://politics.myajc.com/news/state--regional-govt--politics/judge-will-decide-whether-order-georgia-voters-use-paper-ballots/AZrL8mcgsykBm8zf5sbTJP ; The Washington Post, "Paper ballots make a come-back in Virginia this fall" October 7, 2017.
[26] Exhibit "A", pg. 7.1
[27] https://www.dhs.gov/topic/election-security
[28] Congressional Task Force of Election Security, *Final Report,* https://democrats-homeland.house.gov/sites/democrats.homeland.house.gov/files/documents/ TFESReport.pdf.

24

100.    The U.S. Senate Select Committee on Intelligence issued a summary of its investigation into Russian targeting of election infrastructure during the 2016 election, after months of hearings and investigation. [29] Among other things, the Committee issued a strong recommendation for VVPAT. [30]

101.    These findings are in accordance with those of research studies commissioned by California's then Secretary of State Debra Bowen, and also by Ohio's Secretary of State Jennifer Brunner in 2007 regarding the Diebold AccuVote voting system.

102.    The "Top-to-Bottom Review" of California's voting system found that the AccuVote DREs were "inadequate to ensure accuracy and integrity of the election results.."; that the system contained "serious design flaws that have led directly to specific vulnerabilities, which attackers could exploit to affect election outcomes.."; and that "attacks could be carried out in a manner that is not subject to detection by audit, including review of software logs."[31]

103.    The Evaluation and Validation of Election Related Equipment, Standards and Testing ("EVEREST") also concluded that Ohio's voting "system lacks the technical protections necessary to guarantee a trustworthy election under operational conditions. Flaws in the system's design, development, and processes lead to a broad spectrum of issues that undermine the voting system's security and reliability. The resulting vulnerabilities are exploitable by an attacker, often easily so, under election conditions". [32]

---

[29] Exhibit "A", pg. 8.
[30] Exhibit "A", pg. 8.
[31] California Secretary of State, *Withdrawal of Approval*,
http://votingsystems.cdn.sos.ca.gov/vendors/premier/premier-11824-revision-1209.pdf (Dec. 31, 2009 rev.), at 2,2,3.
[32] Pennsylvania State Univ., etal., *EVEREST: Evaluation and Validation of Election-Related Equipment, Standards and Testing,* https://www.eac.gov/assets/1/28/EVEREST.pdf (Dec. 7, 2007).

104.    Citing the failures and vulnerabilities of the Diebold's AccuVote voting system identified in the commissioned report, Secretary of State Bowen decertified California's voting system. [33]

105.    The only record of a voter's selection kept by Shelby County's AccuVote DREs is the digital record created in the DRE's computer memory by the executable software that is installed on the individual DRE voting unit. This digital record is only as trustworthy as the software that writes the information to memory.

106.    As indicated by the TTBR, EVEREST, and other reports, the design of the AccuVote DREs permits unauthorized, surreptitious manipulation of software installed on individual machines that causes the AccuVote DREs to record and report false votes and that is, for all practical purposes, undetectable by election officials.

107.    As indicated by the TTBR, EVEREST and other reports, the results produced by an AccuVote DRE are not reliable because the machine's software, which is responsible for correctly recording voter choices, is subject to undetectable manipulation.

108.    As indicated by the TTBR and EVEREST reports, the results produced by an AccuVote DRE are not trustworthy because the unreliable software is likewise responsible for reading the DRE unit's memory and reporting the recorded results.

109.    Due to the foregoing, the AccuVote DREs do not permit meaningful recounts.

110.    Because the Defendant Secretary and the manufacturer and vendor of the AccuVote DREs and GEMS 1.18.24 software contend that the software is proprietary, the public is unable to determine whether the machines might have been subject to erroneous programming, tampering or manipulation.

---

[33] See *Withdrawal of Approval,* supra fn. 31, at 5.

111.    Flaws in the AccuVote DREs could render the Plaintiffs' votes meaningless or worse,

record a vote for someone the voter did not vote for, without any means for the voter to verify his

vote.

112.    In 2002, Congress enacted the Help America Vote Act (HAVA) which provided $3

billion to states to replace punch card and lever voting systems with new technology and

mandated statewide voter registration systems. Tennessee received over $57 million and used

some funds to replace voting equipment and implement a statewide voter registration system. [34]

113.    About $28 million of the aforesaid $58 million dollars Tennessee received from the

HAVA has not yet been spent, with approximately $15 million designated for new voting

equipment and $13 million for voter registration system updates, administration, accessibility,

and training expenditures. [35]

114.    In March 2018, the Consolidated Appropriations Act of 2018 was signed into law, which

includes $380 million in grants for states to improve the election system (in addition to the

remaining HAVA funds from 2002). States can use these funds to replace non-VVPAT

equipment with VVPAT equipment. Tennessee is eligible to receive $7.6 million of these

funds.[36]

115.    The custom and policy of the Defendants Secretary, Tennessee Election Commission,

State Board Members, Coordinator of Elections, Shelby County Election Commission, Shelby

Board Members, and Shelby Administrator to permit the use of the AccuVote DRE's and GEMS

1.18.24 software in Shelby County elections denies the Plaintiffs their fundamental right to vote.

---

[34] Exhibit "A", pg. 6.
[35] Exhibit "A", pg. 7.
[36] Exhibit "A", pg. 7.

27

116.    The custom and policy of the Defendants Secretary, Tennessee Election Commission,

State Board Members, Coordinator of Elections, Shelby County Election Commission, Shelby

Board Members, and Shelby Administrator to permit the use of the Shelby voting systems,

including AccuVote DRE's and improperly modified and outdated GEMS 1.18.24 software, in

Shelby County elections was designed and implemented with the intent of disenfranchising

Shelby County voters, the majority of whom are African American.

117. The Secretary, majority of the State Board, Coordinator of Elections, majority of the Shelby

Board, and Shelby Administrator are white.

### C. *Voting on Thin Ice Report*

118.    The SAVE members have published a Report titled *Voting on Thin Ice,* which reports the

results of open records requests and investigation over five years. (copy attached as Exb. "D"). [37]

The facts stated in this section of this Complaint are set forth more fully in the Report. Exb. "D".

119.    The SAVE members began work after the August 2, 2012 elections wherein thousands of

Memphis and Shelby County citizens were given the wrong ballot. A SAVE member, Dr. Joseph

Weinberg discovered and alerted the Shelby Board about the voters being given the wrong

ballots as early as July 18, 2012 during early vote, along with a candidate for county

commission.[38]

120.    After repeated requests by Weinberg, action was finally taken by the Shelby Board to

correctly assign the misassigned voters, but the official voter records were being altered during

the process so as to appear that the misassigned voters voted in the correct district. After Dr.

Weinberg's complaint to the Shelby Board, Coordinator of Elections, and State Board, he was

informed that the state had instructed the county how to avoid altering the record, but the pattern

---

[37] Exhibits available via www.votingonthinice.com.
[38] Emails between Dr. Weinberg and SCEC July 18, 2012.

continued. Even one Shelby Board Commissioner was "appalled to read that the participating

voter list is being changed to reflect votes in districts that the voter didn't actually vote in",

wondering if it would "corrupt" the list. [39]

121.    Disenfranchised citizens reported being given the incorrect ballot, with one saying she

voted in two school board district races although only one should have been on her ballot.

[40]Several state legislators wrote a joint letter to state election officials calling for an

investigation. [41]

122.    In addition, about 132 election commission poll workers had to pick-up microchips from

the Shelby Board annex, and receive training <u>on election night</u> for the insertion of the chips into

the electronic poll books. [42]  Presumably they took the microchips home with them, thus

constituting a total failure of any election security as to the electronic poll books used the next

day.

123.    The then Shelby Board Administrator Holden was suspended briefly in September 2012,

and placed on probation.[43] News reports in October 2012 confirmed that over 3000 voters had

been given the wrong ballot.[44]

124.    Despite reassurances that the problems would be fixed before the November 2012

election, again some voters were wrongfully turned away at the polls due to being labeled

"inactive" voters; one voter reported being given a ballot without a gas tax referendum; an

internal poll watcher reported that the Shelby Board internal system showed 801 had voted at

---

[39] Email of Election Commissioner Myra Stiles July 24, 2012.
[40] Emails between Dr. Weinberg and SCEC July 30, 2012.
[41] Joint Letter of Several Legislators to State Election Officials Aug. 14, 2012.
[42] Chumney Letter to DOJ: Public Integrity Section- Aug. 7, 2012.
[43] Tennessee State Election Commission Meeting Minutes Sept. 10, 2012.
[44] *The Commercial Appeal*, "State audit cites Shelby's "inability to conduct elections
without significant inaccuracies", Oct. 2, 2012.

one precinct but the total accumulator only showed 293 votes; others were not allowed to vote although timely submitting voter registration forms; and more voters were found to be listed in the wrong district. [45]

125. One Shelby Board Commissioner in an email to Dr. Weinberg in November 2012, wrote that "I think manipulation occurs inside the Commission either at turn in zones during the course of reconciliation and possibly during tabulation." She elaborates, "It is a mess and I don't fully understand. It occurs every night during early vote and was the major reason totals weren't posted on the web every day. They couldn't get the totals to balance. I worry about what they do to make them balance." The Commissioner added, "There has been rumors that ballots have been backed out but I have not been able to prove". Exb. "E".

126. Over the years there have been ongoing reports of irregularities with the Shelby County Elections as noted by Tennessee Secretary of State, Tre Hargett. On July 26, 2012, he wrote Justin Wilson, Tennessee Comptroller of the Treasury and stated that as of that date one thousand voters had been given the wrong ballot during early voting. Exb. "F". He believed even more voters were given the incorrect ballot thereafter through Election Day. Exb. "F". Additionally, he states that voters in an area annexed by Collierville last year were found not to be listed as. residents of the municipality. Exb. "F".

127. Secretary Hargett further stated that "These recent issues are just the latest in a series of errors in the Shelby County Election Commission stretching back at least a decade. Nearly every election cycle in the county in recent memory has been plagued by a myriad of errors and complaints of wrongdoing." Exb. "F".

---

[45] City of Memphis-City Attorney's Office Election Integrity Task Force, "*Report on November Election Issues, 2012"*.

128.    As Secretary Hargett relays, "In 2010, an election official loaded the wrong information onto an electronic poll book which indicated that thousands of individuals had already cast a ballot when they in fact had not. In 2006, candidates sued the county election commission alleging that irregularities had affected the outcome of the county general election. A 2005 special election to fill a vacant seat in the Senate was voided based on a showing that ineligible felons and deceased individuals had voted in the election." Exb. "F".

129.    Secretary Hargett states that "together [these examples] indicate a troubling pattern of errors that cannot go unnoticed. These errors have eroded public confidence in the Shelby County Election Commission ..". Exb. "F".

130.    On July 2, 2012, Richard Holden, the then Shelby County Election Admistrator reported that invalid characters were reported in the political party field in the school run-off election on December 7, 2010. Since there was no D or R ballot, the space usually holding that D or R was recorded as an "invalid" blank space.

131.    The Shelby County Chancery Court in August 2013, ordered the Shelby County Election Commission to conduct a new election for countywide school board District 4 where some voters residing within the district in the August 2012 election, had a different school board race on their AccuVote DRE ballots and other voters residing outside the district had the District 4 race on their ballots.[46]  Candidate Kenneth Whalum, Jr. successfully contested the results in the trial court, although reversed on appeal. And, prior to that another Chancellor ruled that the results in the 2012 Millington sales tax hike referendum were to be overturned after Millington city

---

[46] Whalum v. Shelby County Election Commission, 2014 Tenn. App. LEXIS 612.

officials contested the certified vote count on the basis that some voters who did not live in Millington were allowed to vote when their votes shouldn't have been counted.[47]

132.    Secretary of State Hargett and Mark Goins, the Tennessee Coordinator of Elections asked the Tennessee Comptroller to conduct an audit of the Shelby County Election Commission Administration. Exb. "F". While the Tennessee Comptroller did conduct an audit, it only "focused on the period January 1, 2012, through July 31, 2012.." except as otherwise warranted, and was "limited to a review of the redistricting activities leading up to and during the 2012 elections." From the report, there was no review or investigation or forensic audit of the voting machines, tabulators, or regarding other complaints raised. [48]

133.    When Plaintiff Mike Kernell wrote a letter to the Comptroller asking questions about the limited scope of the audit, he received a cursory response the next day that "we limited the scope of the review based on the time and resources we had available." In March 2013, Dr. Weinberg also wrote Tennessee Secretary of State Hargett about the November 2012 problems of voters receiving the wrong ballot, and the Comptroller's lack of serious and thoughtful response to Kernell's letter (or recommendations). Dr. Weinberg asked Hargett to request the Comptroller or other consultant with the necessary computer expertise to perform a thorough evaluation. [49]

134.    In October 2013, Dr. Weinberg wrote a report to the Shelby Board asking that the voting machines be replaced as outdated, and questioning whether the machines had ever been updated for security purposes. [50] Despite discussing purchasing new machines and that federal monies were available, the Shelby Board did not take action. [51]

---

[47] The Daily News, "Goldin Overturns Millington Sales Tax Vote", 10/9/2012.
[48]  Tennessee Comptroller Audit Report Oct. 2, 2012.
[49] Dr. Weinberg email to Tennessee Secretary of State Hargett in November 2012.
[50] Dr. Weinberg Report to SCEC- October 3, 2013.
[51] The Commercial Appeal, "Election Commission Looking at Problems", Jan. 20, 2013.

135.    Thereafter, due to the continuing problems, in November 2013, the SAVE members

began open records requests to the Shelby Board. They also reported the problems to the FBI and

DOJ: Public Integrity Section [Washington DC].

136.    The records produced from the open records requests showed that some 21 memory

cartridges were uploaded for the precinct COR 09 *before* the polls closed on August 2012

election day, and 9 thereafter, even though only 9 voting machines had been assigned to that

precinct (one memory cartridge is assigned for each voting machine); that a database was sent

from the election software vendor and no results were found; it was then reported to being sent to

Canada for research; the election was certified prior to the solution being identified; and ES &S

technician had access to the tabulation server without any supervising Shelby Board official; and

many other documented irregularities. Exb. "D".

137.    Because of the irregularities found, a letter was submitted to the DOJ, Asst. U.S.

Attorney for the Western District of Tennessee, and FBI early on August 7, 2014 detailing the

findings, asking for an audit and investigation, inspection of the voting machines and tabulator

by a computer and elections expert.  A follow-up letter was sent on August 27, 2014 again

reporting that COR 09 was the precinct identified by ES & S as causing problems with certifying

the results some 19 days after the August 2, 2012 election. The follow-up letter noted that it was

reported in the *Commercial Appeal* that two federal monitors were in town on August 7, 2014,

but did not observe or inspect the tabulation process on that date despite the request transmitted

on the same date. A forensic evaluation of the voting machines, tabulator and computer data was

requested. There was no response. Exb. "D".

33

138.   Dr. Weinberg uncovered voters misassigned again in the August 2014 elections and notified the Shelby Board and Shelby County Government IT department. [52]

139.   In 2015, more election irregularities were reported regarding some voters being given the wrong ballot in a City Council district race, and all memory cartridges not uploaded in the Shelby County General Session Criminal Court Clerk's election. [53]The SAVE group submitted additional open records requests related to this election, the August 2012 election and others, this time including requests to the Tennessee Election Coordinator, and the Shelby County Court Clerk. Exb. "D".

140.   Despite open records requests to the Tennessee State Election office, Shelby County Clerk, and Shelby Board to review the early vote poll [tally] tapes and Certificates of Results for the August 2, 2012 election, they all only produced Election Day poll tapes from the archives. No early vote poll tapes were produced for the August 2, 2012 election. There also were no early vote tapes at the Tennessee State Election office for the August 2010 election, with only Election Day poll tapes produced for those elections in 2010 and 2012. And, even though the records show that an inquiry was made by a Shelby Board official about backing up the ballot images inside the AccuVote DREs for the August 2, 2012 election, the Shelby County Election Commission has refused to produce those images claiming that they are not public records. Therefore, the Plaintiff SAVE was unable to review them to verify the accuracy of the reported results.[54]

---

[52] Emails of Dr. Weinberg with Shelby County Govt. IT Aug. 7, 2014.
[53] http://www.vibineblog.com/boot-holden ; http://wreg.com/2016/01/26/wanda-halbert-election-commission-appear-in-court-over-election-results
[54] The Shelby Board's position on the ballot images has been inconsistent. Initially, when Dr. Weinberg requested the images, they denied that they existed. Then when the SAVE group referenced their existence in the ES & S election manuals the Shelby Board produced ballot images for a City Council election in October 2015.

141.    In fact, open records responses of emails produced between state officials and the Shelby

Board on September 26, 2012, show that the total results sent by the Shelby Board to the State

Election officials did not match the computer print-out submitted. The Certificate of Results with

numbers that did not match was undated. However, the state election officials accepted the report

"with a promise that you will look into this issue and that we will not have this issue in the

future. Everything should match". Exb. "D". To the best of our knowledge the public and

candidates were never notified, and the emails are weeks after the deadline a candidate was

required to file suit in order to challenge election results in court.

142.    In the October 2015 election, at least 7 memory cartridges, some from mostly African

American voter precincts and representing hundreds of votes, were not uploaded until between

11 and 22 days after Election night. A citizen took a photo of a poll tape at one heavily African

American voter poll, and compared it to the Unofficial Statement of Votes Cast. Finding a large

discrepancy in the votes, a candidate reported it to the Shelby Board. An memo from the Shelby

Board Operations Manager to the Election Administrator on October 26, 2015 states that the

vendor did not mention anything about incomplete uploads, although the Deputy Administrator

reported that he saw the ES & S operating GEMS before he left for the downtown election

offices. Once again, from the emails produced, it appears that the election was certified even

though all of the data about the problems was not available. Exb. "D".

143.    The GEMS Reference manual produced from open records to the Shelby County Election

Commission states that the number of memory cards value entered in the system's Vote Center

Editor may be altered even when the election status is "Set for Election", and that decreasing the

number of memory cards assigned to the Vote Center when the election status is "Set to

Election" may cause programmed or uploaded memory cards [cartridges] to be lost. This means

35

that votes hundreds or thousands of votes could be lost if the alteration occurs and not all memory cartridges are not uploaded.

144.    Even more troubling was the Shelby Board's practice, of only requiring the independent accountants' report to compare a sampling of precinct vote totals from the election results summary to the votes recorded on the machine tapes generated by the Shelby AccuVote DREs. Because of the scope of the agreed upon procedures, the CPAs disclaimed that it was an audit, or any opinion on the accuracy of the tabulation of the votes or the integrity of the election process. There is no record of what poll tapes were in the sample, or how it was derived. Thus, there was no true independent audit of the results.

145.    Also, the Shelby Board will not produce the Shelby County GEMS AVServer logs [audit trail] for review despite open records requests, contending that it is not a public record.

146.    One Shelby Board Commissioner, Norma Lester, expressed concerns on the record about the "discrepancies in the [October 2015] election night totals and those presented for certification."[55] Exb. "D". She further raised the issue of the need for a forensic audit. In July 2013, she had also complained about the "vendor having unfettered access to Security Code and Server" at the Shelby Board offices. Exb. "D".

147.    On August 31, 2016, Bruce Gear, with the DOJ Voting Section [Washington DC], and Raymond Hulser, Chief, DOJ: Public Integrity Section [Washington DC] were written separately, detailing the prior letters, advising of the 2015 October new election irregularities with admitted vote total switching observed on televised returns, and some voters once again given the wrong ballot. [56]The letter further mentioned the reported approximately 100 vote

---

[55] SCEC Meeting Minutes Oct. 23, 2015.
[56] Chumney Letter to Bruce Gear, DOJ Voting Section Aug. 31, 2016 & Raymond Hulser, Chief, DOJ: Public Integrity Section – Sept. 1, 2016.

variances noted up or down in some races from the audited results, the several memory cartridges not read on election night, with no mention by the ES & S vendor of incomplete uploads, and that a lawsuit was filed by a candidate in the Shelby County General Sessions Court Clerk's race where a citizen had taken photos of poll tapes at an election day poll which differed from the unofficial reported results.[57] Exb. "D".

148. The letter to Gear and Hulser, further advised of an ES & S report to the SCEC in 2013 that the tabulation server room was not secure, and had been plugged into the county network exposing it to hacking, virus and malware.[58] The 2013 ES & S report further found that the Shelby Board tabulation server room could be accessed by many people "which makes it difficult to defend against allegations of tampering".

149. This occurred despite a 2007 official state report that raised the same concerns with regard to Shelby County, as well as unauthorized software on its system that could allow manual editing of the GEMS database file, audit log, and election results.[59] More alarming was the finding that "someone was attempting to edit saved Diebold election summary reports, perhaps to agree with altered vote totals in the Diebold Microsoft Access database file". In addition, the report noted a critical security breach where unauthorized software had been installed which would allow "unfettered remote access to the central tabulator to anyone connected to the county government network or the Internet". The Report expressly states that "the GEMS central tabulator should absolutely NOT be connected to any network via Ethernet card, wireless network card, infrared port, USB port or modem".

---

[57] *Wanda Halbert v. Shelby County Election Commission,* Shelby County Chancery Court, No. CH-15-1448.
[58] Shelby County Election Process Final Report, Jan. 7 2013.
[59] *"Trust But Verify: Increasing Voter Confidence in Election Results"*, Tennessee Advisory Commission on Intergovernmental Relations [TACIR] 2007 [Appendix A].

150.    The 2007 TACIR report concluded that "the real threat for wholesale election fraud lies with the Diebold central tabulator". It added that "unless Shelby County election officials can be seen as conducting a good faith investigation as to who had access to this central tabulator PC and the above unauthorized software and who actually did the illegal install, voters in this county (and ultimately the state) can have no confidence in the integrity of the November 2006 election". An recent open records request to the Shelby Board for any documents on any investigation regarding the 2007 report, resulted in a response that it had no documents responsive to the Request.  Exb. "G" and "H".

151.    The group's 2016 letter to the DOJ asked what the FBI had determined from the prior letters of 2012 and 2014, and again asked for action. [60] No response was received.

152.    Open records documents and emails produced further show that a database was sent on August 20, 2012 to the ES & S vendor in an insecure manner. Exb. "D". According to Dennis Boyce, a Shelby Board employee, in 2010 under oath, the databases are regularly sent to the ES & S vendor to "fix". [61] And, the user login, password and instructions to login for an updated voter file was *emailed* to State officials on July 27, 2012 by a Shelby Board official. Exb. "D".

153.    A Shelby Government Internal Audit in 2013 found that "temporary and permanent staff were identified as having administrative rights to ESM similar to the system rights granted to the Shelby Board Administrator, which would allow full permission to make adjustments to the application. This would allow adjustments to the security administration, such as changing passwords to give one the ability to log in as another person, and to make changes to system settings and coding for different applications/modules". In addition, 29 temporary employee user

---

[60] Chumney Letter to Bruce Gear, DOJ Voting Section Aug. 31, 2016 & Raymond
Hulser, Chief, DOJ: Public Integrity Section – Sept. 1, 2016.
[61] Newman, etal, v. Shelby County Election Commission, Shelby County Chancery Court, No. CH-10-1538, Transcript of Dennis Boyce Deposition Sept. 28, 2010, 52: 12-21.

profiles had not been disabled upon their termination of employment. Administrative security for the GEMS system includes the authorizations of users and passwords for the GEMS application, election database and server, and to record and track user access to the GEMS server and the Microsoft operating system. Thus, the failure to follow these protocols has compromised the system.

154.    Documents from the Shelby Board further show that its IT officials are insufficiently trained in the use of the GEMS software, and overly reliant on the ES & S vendor. For example, Boyce testified in 2010 that he was not familiar with various GEMS write-in votes tables, and ranked the then Administrator Holden as having low knowledge of the GEMS software system. Exb. "D". Upon information and belief, ES & S is a privately owned limited liability company, owned by McCarthy Group LLC which is a privately owned investment firm managing over $500 million in assets. The lack of appropriate independent review of the Shelby voting systems, software, tabulator, and voting machines, impermissibly abdicates the duty to protect the right to vote to the unchecked hands of private entities.

155.    The records produced further show that the Shelby Board has used more than one database during an election, more than once, where serious problems have been reported. Emails show that a second database was used for COR-09 voters in the August 2, 2012 election. The use of more than one database has been flagged by election experts as less secure. Exb. "D".

156.    Issues with votes in precinct COR-09 in 2012 were not new, as a lawsuit was filed in 2010 by several candidates where 5390 votes were affected when the May 2010 early vote database [instead of the August 2010 one] was uploaded by the Shelby County Election Commission prior to election day.[62] One election worker told the Tennessee Bureau of

---

[62] Newman, etal v. Shelby County Election Commission, Shelby County Chancery Court, No. CH-10-1538 (2010).

Investigation that another worker had told him that the problem was discovered in pre-election day testing, but not corrected before election day.[63] Staff member Boyce testified that "ES & S wrote the script".[64] Precinct COR-09 again was identified in that lawsuit as having differing votes between the Statement of Votes Cast report for that precinct and the Participating Voter List, with audit logs showing four other locations having unexplained extra vote uploads on the day *prior* to the election.[65]

157.   In the October 2015 election, a second database was also used, with a reported communication break-down between the GEMS software and memory cartridges with the system not recognizing the cards as downloads. Exb. "D".

158.   Responses to open records requests by SAVE, and personal observations, further show an inadequate chain of custody of the memory cartridges from the precincts to the Zone Turn-in Sites. In response to open records requests for logs of the memory cartridges turned in at each site, an attorney for the Shelby Board responded via email of 1/21/14 that "they do not exist. There are no logs because the procedure is, as the cartridges are delivered, the precinct or zone is checked off on a list and the list is not kept". Exb. "D".

159.   In November 2016, Dr. Weinberg personally observed the early voting removal of memory cartridges at the Shelby Board Annex offices, and the upload of the early vote cartridges into the AccuVote DREs for tabulation. From observation there appeared to be multiple opportunities for someone to trade out or upload a cartridge unnoticed. At the beginning only one worker plugged in the early vote machines in each row, cut the seals, opened the machines, turned them on and

---

[63] Office of the District Attorney General, *"Results of Investigation Into Use of Erroneous Voter Data By Shelby County Election Commission in August 5, 2010 Election"* Oct. 25, 2010, pg. 7.
[64] Newman. Et. al, v. Shelby County Election Commission, et. al, Shelby County Chancery Court, No. 10-1538, Transcript of Dennis Boyce Deposition Sept. 28, 2010, pg. 21:17-24, 22:1-7.
[65] However, the proof was not admitted by the Chancellor in the lawsuit due to a chain of custody issue related to the Plaintiffs' expert.

40

printed a tape. This was all done before the Election Day polls closed. Multiple election workers who were uploading the early vote memory cartridges walked in and out a door to the public outer office area near the machines that were being used to upload the memory cartridges to the server. Even the auditor walked away at one point. At least one study has reported that malware can be placed on a cartridge and if inserted into an AccuVote DRE could spread to infect the GEMS server. [66]

160.    The *Voting on Thin Ice* Report further found serous calibration problems reported for the Shelby AccuVote DREs. Dr. Weinberg documented the program to the Shelby Board in October 2015 (as well as again misassignment of voters). Even former Tennessee Attorney General Mike Cody reported that he had difficulty when trying to vote for Congressional candidate Steve Cohen in 2016, when it "defaulted or bounced up to the first person on the ballot".  Exb. "D". And, Shelby Board Commissioner Lester wrote that "there remains[sic] numerous occasions when selecting Hillary the vote flips to Trump and when selecting Trump his is totally removed from the ballot. This is because he is first and there is no where else for him to go". She adds "[t]hese machines have exceeded the life span of acceptably. Two years is the absolute longest we should have to wait. As taxpayers we deserve better and nothing is more important than the integrity of the election process." Exb. "I".

161.    Problems have continued after the *Voting on Thin Ice* Report was completed. For example, at the August 20, 2018 Shelby Board meeting to certify the August 2018 elections, City Councilwoman Patrice Robinson testified to her personnel observation that a former Shelby

---

[66] Univ. of California report, University of California report on Diebold Election Systems Incorporated voting system (Diebold GEMS 1.18.24/AccuVote) , pg. 12-13, 16; see also, "Electronic Voting System is Vulnerable to Tampering", Headline@Hopkins Media Advisory, 8/1/03; *see also* www.verifiedvoting.org/resources/voting-equipment-premier-diebold-accuvote-tsx (contends that TSx is susceptivle to viruses transmitted through its memory card bank, and cautions to report broken seals because a person can install his own software on a TSx once gaining access to the machine).

Board Commissioner, Myra Stiles had been provided the wrong ballot when she sought to vote on a Shelby AccuVote DRE.

162.    On August 2, 2018, Veronique Black, a citizen residing at 3572 Claypool Avenue, Memphis TN, 38111, reports that she attempted to vote at 750 Cherry Road, Memphis TN 38117 (Botanic Gardens), at approximately 6:30pm. When trying to cast her vote for Democratic candidate Craig Fitzhugh, the voting machine would instead show up on the AccuVote DRE as being cast for a Republican gubernatorial candidate. This happened more than four times, even though she attempted to correct the error and notified poll officials. When trying to file a complaint, she was given a number to call the next morning. She tried several times over the course of the week, but only a recording would answer saying that no one was available to take her call.

163.    From the facts set forth above and herein, it is apparent that the problems with the Shelby County voting systems, including voting machines, software, tabulator(s), and election management systems, are pervasive, severe, chronic and persistent and will continue absent declaratory and injunctive relief. There is a systematic breakdown in the voting processes.

164. From the facts set forth above and herein, and the Secretary's own admissions, the voting irregularities from the Shelby AccuVote DRE's is more than just an isolated incident, and thus the pattern occurring over more than a decade without redress shows a discriminatory purpose in that Shelby County has the largest population of African Americans in Tennessee.

165. Problems with the AccuVote DREs have been documented as recently as the past month. On September 18, 2018, the Fulton County Superior Court of Georgia ordered a new election for in a Georgia state legislative race where proof was presented that numerous voters received the

42

wrong ballot. The State of Georgia uses the same Diebold AccuVote DREs as in Shelby County, Tennessee.[67]

166.  Even more alarming are the responses of the Shelby County Election Commission to the Plaintiff SAVE's most recent open records' request. Exbs. "G" and "H". The August 26, 2018 response of the Defendant Shelby Administrator states that it has no documents in its possession as to the following requests: (1) persons having access to the tabulation server for the August 2, 2018 Shelby County Elections; (2) regarding the pre-election and post-election testing of the election computer at the Central Office [GEMS server] which received the tabulated votes from each election collection center zone [Zone Turn In Sites] for the August 2, 2018 Shelby County elections (including early vote), including checking for unauthorized software, unauthorized connection to the internet, hacking, and unauthorized editing of results; (3) regarding the chain of custody of the PCMCIA cards, ballots, poll books, election results cartridges for the Shelby County School Board District 9 election (including early vote); (4) regarding the access to the tabulator by the Election Systems & Software representative(s) from May 25, 2018 to August 6, 2018; (5) regarding any review of the software, tabulator, and/or voting machines used by Shelby County voters by independent expert(s), state, and/or federal official(s) and/or staff, since November 2016; (6) regarding any action taken in response to the *TACIR Trust But Verify* 2007 Staff Report, including documents that identify what person(s) put the editing software on the Shelby County Election Commission voting machines, as well as any investigation of the same, and the results of the investigation. Exbs. "G" and "H".


   D.     SAVE's Demand

---

[67] *Curling, etal, v. Brian Kemp, etal,* No. 1:17-cv-02989-AT (N.D. GA, Atlanta Div.), Dk. #226, pg. 29, paragraph No. 59.

167.    The Defendants State and Shelby Boards, Secretary, Tennessee Election Commission,

Shelby County Election Commission, Coordinator of Elections, and Shelby Administrator are

aware of the problems with the Shelby voting systems, including AccuVote DREs, machines and

systems, as recently as July 9, 2018 when the SAVE members testified and presented the *Voting*

*on Thin Ice* Report at the regular Tennessee Election Commission meeting asking that they be

replaced.

168.    At the aforesaid regular meeting, the Plaintiff SAVE members further brought to the

Defendant State Board's attention that its minutes do not reflect that the Shelby County

AccuVote DRE and GEMS v.1.18.24 were ever recertified. They asked that the current Shelby

voting systems be replaced with paper ballots and an optical scan system; that the software,

tabulator, and machines be examined and internally audited; as well as requesting the State

Board to refer the *Voting on Thin Ice* Report to the Tennessee Attorney General, Comptroller,

and Tennessee Bureau of Investigation for review and action.

169.    At the aforesaid regular meeting, Mark Goins, the Coordinator of Elections for the State

of Tennessee, stated that the SAVE members were correct that the minutes did not reflect that

the Shelby GEMS 1.18.24 had ever been certified, but claimed there was a clerical error as to the

initial certification. Goins, however, was completely unable to explain why the Shelby AccuVote

DREs and GEMS 1.18.24 were not listed in the official State Board minutes as ever being

recertified.  Exb. "B".

170.    At the meeting, Goins testified that a "peek" had been taken by the Tennessee

Comptroller in 2012 on the issues, but acknowledged that the office did not have the resources to

do a forensic audit. What is unexplained by Goins, or any other state officials, is how the state

law for recertification could have been complied with, if (1) the State and Shelby Board minutes

44

do not reflect that the Shelby voting systems in use was <u>re</u>certified; and (2) neither the

Coordinator of Elections (nor the Comptroller) has ever reexamined [internally or externally] the

Shelby AccuVote DREs and GEMS 1.18.24, and tabulators (assuming they ever were examined

in the first place).

171.    Goins further admitted that the Shelby Board had not complied with state law to audit all

tally [poll] tapes for many years, and had been only auditing a percentage of the tapes.

172.    After discussion, the State Board Members declined to refer the matters set forth in the

*Voting on Thin Ice* Report to the Tennessee Attorney General and Comptroller on a divided vote.

173.    On September 30, 2018, the Plaintiffs SAVE faxed a demand letter to the Defendants

Tennessee Secretary of State Tre Hargett, the State Board Members, the Coordinator of

Elections, the Shelby Board Members, and the Shelby Administrator Linda Phillips asking,

among other things, that the voting machines, software, and tabulators be inspected, and that they

ask the U.S. Dept. of Homeland Security to provide a full cyber scan. Exb. "J".

174.    At the date of filing this Complaint only the Defendant Secretary and Goins have

responded to the SAVE September 2018 demand, with a letter from the Coordinator of Elections.

Exb. "K". In the October 4, 2018 letter, Goins states that the Shelby County Election

Commission is responsible for "protecting the technology used to conduct elections from

malicious actors who want to jeopardize the integrity of the election process".  Exb. "K". While

he states that the Shelby County Election Commission has been educated and trained on

cybersecurity and cyber-hygiene best practices, nowhere does he state whether or not any such

best practices have been implemented, or that he is providing any oversite. Exb. "K".

175.    In his October 4, 2018 letter, Goins denies the request for SAVE's expert to examine the

Shelby voting systems, software, and tabulators. Exb. "K". He contends that the chairs of the

45

political parties, independent candidates and the press are notified when the voting machines are inspected and tested. Exb. "K". However, such inspection does not allow the party leaders, independent candidates or press to examine the internal software for the voting machines, and tabulator(s).

176.    In his October 4, 2018 letter, Goins states that candidates can photograph poll tapes posted on the election precinct door after voting ends, but nowhere states that they will have the opportunity to inspect the internal software for the voting machines and tabulator to ensure that the printed poll tapes accurately record a voter's ballot choices. Exb. "K".

177.    In his October 4, 2018 letter, Goins states that the decision to purchase new voting equipment rests with the Shelby County Election Commission, even though the Secretary, Tennessee Election Commission and State Board are charged with certifying, recertifying and decertifying any voting systems and machines to be used in the State of Tennessee. Exb. "K".

178.    The Defendants Secretary, Tennessee Election Commission, State Board Members, Coordinator of Elections, Shelby County Election Commission, Shelby Administrator, and Shelby Board Members have failed to examine the Shelby voting systems, including the AccuVote DREs and GEMS software, for certification and/or recertification with uniform testing criteria that complies with the Tennessee Election Code, and have refused proper requests for examination.

179.    In the alternative, any alleged certification and/or recertification of the Shelby voting systems, including the AccuVote DREs and GEMS software, by the Defendants was arbitrary and capricious, and based upon a mistaken view of the law, in that they do not meet state or federal standards, and they should be decertified.

46

**D. Relevant Statistics and Facts Regarding Shelby County, and the State of Tennessee**

180.    The State of Tennessee is comprised of 95 counties. Two of said 95 counties are Shelby County and Hamilton County.

181.    According to the 2010 U.S. Census, the population of Shelby County is 927,644. Of that population, the race of 40.60 percent is White, the race of 52.10 percent is Black, Hispanic is 5.60 percent, Asian is 2.30 percent, and others the balance.[68]

182.    The population of Hamilton County is 357,738. Of that population, the race of 71.3 percent is White and the race of 19.2 percent is Black, Hispanic 5.42 percent, Asian is 1.92 percent, and others the balance.

183.    Shelby County has the largest population in Tennessee, and has the largest population whose race is Black (African American).

184.    According to the Shelby County Election Commission as of September 2018, the registered voters in Shelby County have the following racial makeup[69]:

        Black 161,903
        White 118,070
        Hispanic 1396
        Other 230,605
TOTAL       511,974

185.    Hamilton County uses the Dominion Image Cast Optical Scan voting machines and election management systems, which has an Optical Scan Ballot system.[70]

186.    According to the Defendant Secretary, Hamilton County has 194,057 registered voters as of June 1, 2018.

---

[68] Shelby County Government website, "Demographics".
[69] Shelby County Election Commission Website, "TN- Voter Registration Ward-Precinct Stat File Detail", 9/4/18.
[70] Tennessee Secretary of State "Voting Systems by County".

47

187.   Shelby County, Tennessee has the largest number of registered voters in the State of Tennessee, and the largest number of registered voters whose race is Black in the State of Tennessee.

188.   No other county in the State of Tennessee uses the ES & S AccuVote TSX.[71]

189.   In July 2018, a Shelby County Chancellor issued an order for the Shelby County Election Commission to open more early voting sites and days earlier as a result of a lawsuit filed by the NAACP, after arguments that the plan to open only three sites in Germantown, East Memphis, and Whitehaven would have suppressed vote in predominately black neighborhoods.[72] The allegations of the lawsuit and the resultant relief granted supports the Plaintiffs claims of a discriminatory pattern and practice on the part of the Shelby County Election Commission.

## VI.   SPECIFIC ALLEGATIONS

### A. Conduct of All Defendants—Past and Threatened.

190.   All Defendants, at all times material to this Complaint, knew that the Shelby voting systems, including the AccuVote DREs and GEMS software, did not, do not, and can not meet Tennessee's statutory and regulatory requirements for certification, recertification, equipment, safety, security, and accuracy.

191.   All Defendants, at all times material to the Complaint, knew or should have known of numerous expert opinions and academic research identifying security vulnerabilities in AccuVote DREs and advising against the use of AccuVote DREs in public elections because of their demonstrable lack of safety, reliability, and trustworthiness.

---

[71] Tennessee Secretary of State, "Voting Systems by County".
[72] The Commercial Appeal, "Shelby County chancellor aims at early voting compromise with modified order", 7/9/18; NAACP, et. al, v. Shelby County Election Commission, No. CH-18-1003.

192.     All Defendants, at all times material to this Complaint, knew or should have known that they were incapable of confirming the integrity of the Shelby voting systems, including the improperly modified GEMS 1.18.24 and  AccuVote DREs, and incapable of certifying that election results produced by the same  are correct, given that malicious manipulations may be generally undetectable, in part because of the inferior engineering of the system.

193.     By choosing to move forward in using the Shelby voting systems to conduct the November 2016 general election, the August 2018 elections, and other elections from November 2016 to the present, all Defendants caused the Plaintiffs and Shelby County voters to cast votes on an illegal and unreliable system that must be presumed to be compromised and that is incapable of producing verifiable results.

194.     Defendants' actions have harmed Plaintiffs by creating a fundamentally unfair system of voting in violation of the *Fourteenth Amendment's* Due Process Clause.

195.     Defendants' actions have specifically and individually harmed Plaintiffs by diluting their votes and thereby denying them the right to vote in violation of the Equal Protection Clause of the *Fourteenth Amendment*.

### B. Standing

196. Plaintiff SAVE has organizational standing, on its own behalf, to bring each of the claims for prospective relief stated in this Complaint because SAVE has been and will be directly harmed by the diversion of resources from its purposes of research and education in order to bring, fund, and participate in this litigation.

197.     Plaintiff SAVE also has organizational standing, on behalf of SAVE's individual Tennessee members threatened with imminent injury-in-fact, to bring each of the claims for prospective relief stated in the Complaint because: (1) at least one of SAVE's members would

have standing to sue each Defendant on each claim in his or her own right; (2) the interests SAVE seeks to protect are germane to SAVE's organizational purpose described above; and (3) the prospective injunctive and declaratory relief requested does not require the participation of SAVE's individual members in this lawsuit.

198.    At all times, Plaintiff SAVE's membership has included at least one eligible voter of the State of Tennessee who is a resident of Shelby County, Tennessee.

199.    The Individual Plaintiffs have standing because each of them suffered concrete and particularized harms, and are now threatened with imminent additional injury-in-fact as a result of Defendants' prior and intended future unconstitutional continued use of the Shelby voting systems, including the AccuVote DREs and the improperly modified and outdated GEMS software, along with the failure to properly inspect, audit, train, secure, monitor, protect, upgrade, provide adequate security patches, and program the GEMS software and AccuVote DREs.

### Past Injury

200.    The Individual Plaintiffs voted by DRE in each of the last several elections for which they were eligible, including most recently the Shelby August 2018 elections. Said plaintiffs were deprived of their right to vote in a verifiable, reliable election conducted in a manner that ensured that his or her vote would be counted accurately.

201. All of the above Plaintiff SAVE members and Individual Plaintiffs were injured by being required to vote in an election conducted using Shelby voting systems, including the AccuVote DREs and GEMS 1.18.24 improperly modified and outdated software, which deprived them of their right to participate in a trustworthy and verifiable election process that safely, accurately,

50

and reliably records and counts all votes cast and that produces a reliable election result capable of being verified as true in a recount or election contest.

202.    All of the foregoing Plaintiff SAVE members and Individual Plaintiffs were additionally injured by being required by Defendants to cast votes on Shelby AccuVote DREs—and thereby to suffer violations of their constitutional rights—as a condition of being permitted by Defendants to enjoy the benefits and conveniences of casting a ballot in person.

**Imminent Future Injury**

203.    Each of Plaintiff SAVE's members, and the Individual Plaintiffs intend to vote in the November 2018 election, and thereafter in Shelby County, Tennessee.

204.    Each of SAVE's members, and the Individual Plaintiffs and proposed Class Plaintiffs, will be required to cast their votes in the November 2, 2018 election using Shelby's voting systems, including the AccuVote DREs and GEMS improperly modified and outdated software, or to suffer the burdens required to obtain and cast a mail-in absentee ballot as an alternative.

205.    Each of Plaintiff SAVE's members, the Individual Plaintiffs, and the Class Plaintiffs voting in the November 2018 and subsequent elections, will be irreparably injured, among other things, by suffering burdens and infringements on the fundamental right to vote caused by having to use Shelby voting systems that cannot be relied upon for a trustworthy and verifiable election result.

206. None of Plaintiff SAVE's members, or the Individual Plaintiffs, and proposed Class Plaintiffs can be adequately compensated for these harms in an action at law for money damages brought after the fact because the violation of constitutional rights is an irreparable injury.

51

## VII. CLAIMS

## COUNT I: FUNDAMENTAL RIGHT TO VOTE

## 42 U.S.C. 1983

207.    Plaintiffs incorporate and reallege each of the foregoing paragraphs 1- 206 above.

208.    The right of all eligible citizens to vote in public elections is a fundamental right of individuals that is protected by the United States Constitution and incorporated against the States by the Due Process Clause of the *Fourteenth Amendment. See League of Women Voters v. Brunner, 548 F. 3d 463 (6th Cir. 2008).*

209.    Inherent in individuals' fundamental right to vote is the right to participate in a trustworthy and verifiable election process that safely, accurately, and reliably records and counts all votes cast and that produces a reliable election result capable of being verified as true in a recount or election contest.

210.    The Due Process Clause is implicated, and 42 U.S.C. 1983 relief is appropriate in the exceptional case where the state's voting system is fundamentally unfair. *See League of Women Voters v. Brunner, 548 F. 3d 463 (6th Cir. 2008).*

211.    The voting systems in Memphis and Shelby County, Tennessee elections suffer from non-uniform standards, processes, and rules, and employs untrained or improperly trained personnel, and that has wholly inadequate systems, and procedures, all with a deliberate indifference to the rights of the citizens. These deficiencies deny the Plaintiffs and all Shelby County citizens the fundamental right to vote in violation of the Due Process Clauses.

212.    The problems with the Shelby voting systems, as acknowledged by the Defendant Tennessee Secretary of State, date back at least a decade and are pervasive, severe, chronic, and persistent.

52

213.     By requiring the Plaintiff SAVE members, Individual Plaintiffs, and the proposed Class

Plaintiffs to vote using the Shelby voting systems, including the Shelby AccuVote DREs and the

GEMS software, in the upcoming November 2018, and subsequent elections, the Defendants will

knowingly burden severely and infringe upon the fundamental right to vote of the Plaintiff

SAVE Member Plaintiffs, Individual and Class Plaintiffs, and will also injure Plaintiff SAVE by

causing it to divert resources, time, and personnel from other projects to bring this lawsuit.

214. These severe burdens and infringements caused by Defendants' conduct will violate the

fundamental right to vote of the Plaintiffs.

209. These severe burdens and infringements caused by Defendants' conduct are not outweighed

or justified by, and are not necessary to promote any substantial or compelling state interest that

cannot be accomplished by other, less restrictive means.

215.     Requiring voters to suffer these severe burdens and infringements upon their

constitutional right to vote as a condition of being able to enjoy the benefits and conveniences of

being permitted to cast their ballots in person at the polls violates the unconstitutional conditions

doctrine.

216.     The foregoing violations will occur as a consequence of the Defendants Hargett, the State

Board & Members, the Coordinator of Elections, the Shelby Board Administrator, and the

Shelby Board & Members acting under color of state law. Accordingly, Plaintiff SAVE and the

Individual Plaintiffs bring this cause of action for prospective equitable relief against the

Defendants pursuant to 42 U.S. C. 1983.

217.     Unless the Defendants are enjoined and mandamus ordered by this Court, then the

Plaintiffs will have no adequate legal, administrative, or other remedy by which to prevent or

53

minimize the irreparable, imminent injury that is threatened by Defendants' intended conduct. Accordingly injunctive relief and prospective relief against these Defendants is warranted.

218.     Due to the closeness of the November 2018 elections, the Plaintiffs acknowledge that it may be impracticable for the Defendants to be required to purchase new voting machines, or utilize paper ballots for all voters in that election. However, the Court may order other safeguards to provide a more secure vote, such as requiring DHS Homeland Security cyber-security scans, inspection of the Shelby voting systems, machines, software, and tabulators by an Independent Master and/or the Plaintiffs' expert, and the other relief requested in the prayer.

219.     The Shelby Administrator has publically announced that the Shelby County Election Commission is reviewing purchasing new voting machines and systems, with the possible implementation of 50% by the October 2019 municipal elections. This piecemeal approach would arbitrarily immediately deprive 50 % of the voters to equal opportunity for a fair ballot if required to still vote on the AccuVote DREs. And, the Shelby County Election Commission website still states as of October 6, 2018, that the Commission is not planning to replace them until 2021.[73]

220.     Shelby Administrator Linda Phillips testified at the July 9, 2018 State Board meeting that the Shelby County Election Commission and Board Members hoped to have new voting machines and systems by the 2020 Presidential election. However, she also said that the Shelby Board was looking at a "hybrid" touchscreen system where a voter could review their ballot on paper created by a digital touchscreen. The system she referenced is not as secure as having the voter mark hardmark choices on a paper ballot and then having that optically scanned by a

---

[73] www.shelbyvote.com.

54

machine. Nor, does it comply with Tenn. Code Ann. 2-20-106 that "every effort shall be made to purchase United States manufactured precinct-based optical scan voting systems".

221.    The reason for a delay to 2020 or 2021 to purchase new voting technology and equipment is further unexplained, in that Shelby Administrator Phillips also testified to the State Board in July 2018 that Shelby County had allocated the funds for the new voting system and machines, and further that the county finance chair was not opposed to incurring debt to purchase a new voting system.

222.    The Shelby Board has announced in the past that it was considering purchasing new voting machines, as far back as 2013[74], but to date the same voting systems are in place that it purchased in 2006.

223.    The failure of the  Defendants Secretary, Tennessee Election Commission, State Board Members, Coordinator of Elections, Shelby County Election Commission, Shelby Board Administrator and Shelby Board to properly examine the Shelby voting systems for certification, recertification; their improper certification and/or recertification of the Shelby voting systems; and/or failure to  examine in order to decertify the Shelby Voting systems, including the AccuVote DREs and improperly modified and outdated GEMS 1.18.24 software, prevents the voters from knowing if current electronic voting machines will accurately count their votes.

224.    The *Voting on Thin Ice* Report accurately documents the failure of these Defendants to properly audit the votes, failure to provide functional voting machines, and repeated failures to provide the correct ballot so that a citizen can vote in the district(s) where he or she resides.

225. The Defendants' actions and inactions have cheapened, devalued, and diluted the votes of the Plaintiffs.

---

[74] *The Commercial Appeal* "Election Commission Looking at Problems" Jan. 20, 2013.

226.    Defendants' deprivation of Plaintiffs' constitutional rights under color of state law violates 42 U.S.C. 1983.

227.    Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which will cause them irreparable harm.

228.    Accordingly, Plaintiffs are entitled to declaratory and injunctive relief as requested in this Complaint and the Prayer for Relief.

229.    Plaintiffs respectfully request that this Court permanently enjoin the Defendants from requiring Shelby County voters to vote using the Shelby voting systems, including the AccuVote DREs and GEMS 1.18.24, after December 2018; and grant such other relief as may be warranted and as set forth in the prayer for relief.

## COUNT II: EQUAL PROTECTION

### 42 U.S.C. 1983

230.    Plaintiffs incorporate and reallege each of the foregoing paragraphs 1 through 206.

231.    The Equal Protection Clause of the *Fourteenth Amendment* to the United States Constitution guarantees qualified voters a substantive right to participate equally with other qualified voters in the electoral process. This equal right to vote applies as well to the manner of its exercise. *See Hunter v. Hamilton County Bd. of Education, 635 F. 2d. 219, 234 (6th Cir. 2011).* A state may not arbitrarily impose disparate treatment on similarly situated voters.

232.    All Plaintiff Members, Individual, and Class Plaintiffs have the right to have their vote counted in a reliable and secure manner on the same basis as citizens and residents of Tennessee's other 94 counties.

233.    By requiring the Member Plaintiffs, Class and Individual Plaintiffs to vote using the Shelby voting systems, including the AccuVote DREs and the improperly modified and outdated

GEMS 1.18.24 software, in the November 2018, and elections thereafter, the Defendants will knowingly treat the Plaintiffs differently than other similarly situated voters in the same election who reside in Tennessee counties that do not use the Shelby voting systems, including DREs, as part of their voting systems, such as Hamilton County.

234.    By requiring the Plaintiff class, and the Member Plaintiffs and Individual Plaintiffs, to vote using AccuVote DREs in elections after November 2018, but other voters in Shelby County to use newly purchased more secure voting machines proposed to be purchased, Defendants will knowingly treat those Plaintiffs who vote by AccuVote DREs differently than other similarly situated voters in the same election who reside in Shelby County.

235.    Shelby County has the largest number percentage of residents in Tennessee whose race is Black. The Tennessee counties who use voting systems that provide a VVPAT have substantially less black voters than Shelby County. The use of the Shelby voting systems, including the AccuVote DRE machines and improperly modified and outdated GEMS 1.18.24 software, in Shelby County has a disproportionate impact on Black voters in the State of Tennessee. Thus, use of the AccuVote DRE machines disenfranchises voters whose race is Black.

236.    Because of these differential treatments, Plaintiffs who vote by DRE in Shelby County will suffer greater and more severe burdens and infringements on their underlying substantive rights—namely the fundamental right to vote, the right to freedom of speech and association, than will other similarly situated voters in Tennessee counties that do not use the Shelby voting systems, AccuVote DREs and improperly modified and outdated GEMs software as part of their voting systems.

57

237.    These severe burdens and infringements that Defendants will impose unequally on the Plaintiffs who vote by DRE will violate the Equal Protection Clause of the *Fourteenth Amendment*.

238.    By reason of the foregoing, the Defendants acting under color of state law, have deprived and will continue to deprive Plaintiffs of equal protection under the law secured to them by the Tennessee Constitution by requiring them to vote on the Shelby voting systems which citizens in other counties vote on VVPAT systems.

239.    These severe burdens and infringements caused by Defendants' conduct are not outweighed or justified by, and are not necessary to promote, any substantial or compelling state interest that cannot be accomplished by other, less restrictive means.

240.    Requiring voters to be deprived of their constitutional right to equal protection of the laws as a condition of being able to enjoy the benefits and conveniences of voting in person at the polls violates the unconstitutional conditions doctrine.

241.    The foregoing deprivations of Plaintiffs' constitutional rights by the Defendants' acting under color of state law violates 42 U.S.C. 1983.

242.    The Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein which will cause them irreparable harm.

243.    Accordingly, the Plaintiffs bring this cause of action for prospective equitable relief, declaratory judgment, injunctive relief and mandamus against the Defendants pursuant to 42 U.S.C. 1983.

244.    Unless the Defendants are enjoined by this Court, then the Plaintiffs will have no adequate legal, administrative, or other remedy by which to prevent or minimize the irreparable,

imminent injury that is threatened by Defendants' intended conduct. Accordingly, injunctive relief and prospective relief against these Defendants is warranted.

245.   Plaintiffs respectfully request that this Court permanently enjoin the Defendants from requiring Shelby voters to vote using the Shelby voting systems, including the AccuVote DREs and GEMS 1.18.24 software, after November 2018; and grant such other relief emergency temporary and preliminary injunctive relief, as may be warranted as set forth in the prayer for relief.

## COUNT III

## DECLARATORY JUDGMENT

246.   The Plaintiffs incorporate and reallege each of the foregoing paragraphs 1 through 206.

247.   Under 28 USC 2201(a), this Court may enter a Declaratory Judgment.

248.   This Court has supplemental jurisdiction under Tenn. Code Ann. 29-14-113 to enter a Declaratory Judgment.

249.   Plaintiffs seek an injunction prohibiting the use of the Shelby voting systems, including the AccuVote DRE machines and improperly modified and outdated GEMS 1.18.24 software, in Shelby County, Tennessee for all public elections from December 2018 forward, and that the Court declare the Shelby voting system currently in place unconstitutional under the *Fourteenth Amendment* to the U.S. Constitution and fundamentally unfair.

250.  Likewise the Plaintiffs ask that the Court declare the Shelby voting systems currently in place unconstitutional under the Tennessee Constitution.

251.   The Plaintiffs ask that the Court declare that the Defendants have failed to ensure that the freedom and purity of the ballot is safeguarded as required in the State of Tennessee.

252.    The Plaintiffs ask that the Court declare that the Defendants have failed to insure that the Shelby voting systems ensure that the total votes cast reflect the will of the majority of the participating voters as required in the State of Tennessee.

253.    The Plaintiffs ask that the Court declare that the Defendants have failed to ensure that uniform procedures are in place for the elections as required by the State of Tennessee.

254.    The Plaintiffs ask that the Court declare that the Defendants have certified and/or allowed the use of electronic computers for tabulation of election results in Shelby County which are not programmed to accurately report votes, contrary to the Tennessee Constitution, laws and state rules.

255.    The Plaintiffs ask that the Court declare that the Defendants have failed to examine and/or reexamine the Shelby tabulators, election management system, voting machines, software, and equipment as required by state law and rules.

256.    The Plaintiffs ask that the Court declare the systemic problems in election administration at the Shelby County Election Commission and the Shelby voting systems violates the rights under the Tennessee Constitution of each Shelby County voter to have their votes accurately and reliably counted.

## COUNT IV

## MANDAMUS

257.    The Plaintiffs reallege each of the foregoing paragraphs 1 through 206.

258.    The Defendants have violated the Tennessee Election Code and Tennessee Constitution by using inadequate examination procedures in using and/or certifying AccuVote DREs that (1) are not reliable or consistent in the recording and counting of votes; (2) are not secure; (3) do not

provide a means for voters to verify that the voting machine properly recorded or counted their votes; and (4) do not provide a means for anyone to determine the actual votes cast in an election

259.    The Plaintiffs seek an order of mandamus compelling the Defendants to decertify and discontinue use of the Shelby voting systems, including the AccuVote DRE machines, and improperly modified and outdated GEMS 1.18.24 software, used in Shelby County, Tennessee; to establish uniform testing criteria that comply with the Tennessee Election Code; and/or to re-examine the Shelby voting systems, and grant the other relief requested in the prayer for relief.

## COUNT V

## CLASS REPRESENATATION

260.    The Plaintiffs incorporate and reallege each of the foregoing paragraphs 1 through 206.

261.    Plaintiffs request class certification. The potential plaintiffs exceed 927,000 individual residents of Shelby County, Tennessee, including over half of the residents whose race is Black. The claims for relief have common issues of law and fact. The defenses to the claims are likewise typical for the entire class. The representative parties will fairly and adequately protect the interests of the class.

262.    The prosecution of separate actions by class members would create a risk of inconsistent judgments or outcomes which would be disastrous to the right to vote in Shelby County, Tennessee. The common issues of law and fact, the right to vote and have that vote count in Shelby County, Tennessee, predominate over any questions affecting individual members.

263.    The Representative Plaintiffs move that their counsel of record be appointed as class counsel.

**PRAYER FOR RELIEF**

1. That proper process issue and be served upon the Defendants, requiring the Defendants to answer this Complaint within the time required by law.

2. Enter a judgment finding and declaring it unconstitutional for any public election in Shelby County, Tennessee to be conducted using any model of DRE voting equipment from November 7, 2018 forward;

3. Enter an Order of Mandamus directing the Defendants replace **all** Shelby County voting machines, election management systems, tabulators, and software before the next elections conducted by the Shelby Board, and replace the same with at least an optical scan system with hand marked paper ballots, or a sole paper ballot system;

4. Enter a preliminary and permanent injunction prohibiting Defendants from requiring Shelby County, Tennessee voters to vote using the Shelby County voting systems, including the AccuVote DREs, and improperly modified and outdated GEMS 1.18.24 software, from November 7, 2018 forward;

5. Enter an emergency temporary, preliminary and permanent injunction prohibiting Defendants from conducting or authorizing the conduct of any public election in Shelby County, Tennessee without requiring subordinate election officials to permit, meaningful public observation of all stages of election processing, including observation of the tabulators and handling of memory cartridges at the Zone Turn-In sites.

6. Enter an emergency Order of Mandamus that the Defendants jointly ask the U.S. Department of Homeland Security to perform all cyber hygiene scans, risk and vulnerability assessments, and other offered services with regard to the security of the Shelby voting systems (and tabulators), including following all resultant best practice

recommendations before voting begins in Shelby County on October 17, 2018, and report to the Court on the same.

7. Enter an emergency Order of Mandamus requiring the Defendants to have ES & S install advanced threat monitoring sensors known as Albert network security sensors in the Shelby County voter registration environments before voting begins in Shelby County on October 17, 2018, to remain throughout the election, and afterwards.

8. Allow the Plaintiffs' expert, or an agreed independent expert, and/or Independent Master, to review the Shelby County's voting systems, including the AccuVote DREs, GEMS software, and tabulator(s), prior to use of the voting machines; immediately prior to the commencement of early voting on October 17, 2018; and immediately prior to November 6, 2018 election day voting;  and report any findings of unauthorized software or improprieties to the Court and appropriate law enforcement authorities.

9. Allow the Plaintiffs' expert, or an agreed independent expert, or an Independent Master, to review the Shelby voting systems, including election management systems, AccuVote DREs, GEMS software, and tabulators, immediately after the county's voting ends on November 6, 2018, and report any findings of unauthorized software to the Court, TBI, FBI, candidates and the public at large.

10. Enter an Order of Mandamus requiring the Defendants to remove any remote access software on the Shelby County voting systems, including AccuVote DREs, GEMs software, election management systems, and/or tabulators before voting begins on October 17, 2018, and prohibiting any such software to be installed and/or utilized thereafter.

11. Enter an Order of Mandamus requiring two-factor authentication for elections officials who access the Shelby County's voting systems to be implemented by the Defendants immediately.

12. Enter an Order of Mandamus requiring the Defendants to install any security patches and upgrades to the Shelby County's voting systems, including election management systems, AccuVote DREs, GEMS software, and tabulators

13. Enter an Order of Mandamus requiring the Defendants Shelby County Election Commission, Shelby Board and Shelby Election Administrator to allow poll watchers for candidates, as well as the Plaintiff Shelby Advocates for Valid Elections, to watch the collection of memory cartridges at the election Zone Turn-In Sites, and also the process of tabulation of votes (at the tabulators located in the annex and/or downtown SCEC offices).

14. Enter an Order of Mandamus requiring the Defendants to immediately notify the candidates and the public of any irregularities in the Shelby County elections, including the use of more than one database, broken seals on voting machines and equipment, uploads of votes prior to the close of polls at 7pm on election day, missing memory cartridges and cards, the upload of extra memory cards and cartridges, the addition and/or removal of any voting machines at polls after the first day of early vote (with the polls identified and the reason for the addition(s)/removal(s) provided), problems with electronic poll books, and any breaches of the Shelby voting systems before, during and/or after the votes are cast.

15. Require the Defendants to conduct criminal background checks for any vendors, poll workers, staff, and volunteers, who have access to the Shelby County voting machines,

64

election management system, GEMS software, and/or tabulators, and publish the names of any such person(s) to the public and candidates.

16. Entire an Order of Mandamus authorizing the Plaintiffs' expert, or an agreed independent expert, or an Independent Master, to inspect the Shelby County voting systems audit logs, election equipment, and tabulators from the date that the election management system and tabulators are inspected pre-election (as set forth above) through the date that the post-election audit is completed and before certification is sought from the local or state officials;

17. In the alternative, enter an Order of Mandamus that the Defendants (1) examine or re-examine the Shelby County voting machines, election management systems, tabulator(s) and GEMs software; (2) decertify the Shelby County AccuVote DREs, election management systems, tabulator(s) and software; (3) establish uniform testing criteria for any subsequent machines, systems, tabulators and software that comply with the state and federal constitutions and laws; (4) report any unusual findings from the examination or reexamination of the Shelby County voting systems (including voting machines, election management systems, tabulators, and software) to the Tennessee Attorney General, Tennessee State Comptroller, FBI, U.S. Department of Justice, DHS, Tennessee Homeland Security, and Tennessee Bureau of Investigation.

18. Enter an emergency Order of Mandamus that the Defendants Shelby County Election Commission, Shelby Board and Shelby Administrator perform parallel audits and final risk limiting audits on the AccuVote DREs and the absentee ballots before certifying the November 2018 election;

19. Enter an Order of Mandamus that the Defendants Shelby County Election Commission, Shelby Board, and Shelby Administrator track with written documentation all memory cartridges and cards, including from the time the precinct opens, during voting, and after it closes to the time brought to collection Zone Turn-in Sites, and also the Shelby County Election Commission offices (and compliance with requirements that one official from each political party transport the cards in the same vehicle together).

20. Enter an Order of Mandamus requiring that the Defendants Shelby County Election Commission, Shelby Administrator and Shelby Board require all memory cartridges to be brought directly to the Shelby County Election Commission offices instead of Zone Turn-in sites on Election Night for the November 2018 elections, and enjoining any remote transmission of election results from the Zone-Turn In sites, poll precincts, or otherwise to the GEMS server for tabulation.

21. Enter an Order of Mandamus to the Defendants requiring all voter complaints to be timely reported to the public before certification of the November 2018 elections, and thereafter.

22. Enter an Order of Mandamus to the Defendants that all digital ballot images be preserved from the November 2018 elections, and backed up; that the audit logs be produced; and that the Shelby voting systems, including the tabulator(s), shall be preserved and not disposed of nor discarded until independent expert inspection is performed with a report to the Court.

23. That a judgment be entered for the Plaintiffs against the Defendants, jointly and severally.

66

24. Retain jurisdiction to ensure all Defendants' ongoing compliance with the foregoing Orders;

25. Grant Plaintiffs an award of their reasonable attorney's fees, costs, and expenses incurred in this action pursuant to 42 U.S.C. 1988; and

26. Grant Plaintiffs such other relief as the Court deems just and proper.

Respectfully submitted.

CAROL CHUMNEY LAW PLLC

By: /s/Carol J Chumney
Carol J.Chumney, Esq. (#012021)
Attorney for the Plaintiffs
5050 Poplar, Suite 2436
Memphis, TN 38157
(901) 844-7141
carol@carolchumneylaw.com

67

SHELBY ADVOCATES FOR VALID ELECTIONS

By: _____

Michael Kernell, Director

**STATE OF TENNESSEE;**

**COUNTY OF SHELBY:**

      Before me, a Notary Public of the state and county mentioned, on this 11th day of Oct, 2018, personally appeared Michael Kernell, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself to be a Director of SHELBY ADVOCATES FOR VALID ELECTIONS, the within named bargainor, a non-profit corporation, and that he, as such Director, verified the foregoing Complaint for the purposes herein contained, by signing the name of the corporation by himself as Director.

My Commission Expires: 3·16·21

_10·11·18_                  _____

SHERRY E. VOYLES
STATE OF TENNESSEE
NOTARY PUBLIC
COUNTY OF SHELBY
MY COMM. EXP. MARCH 16, 2021

**VERIFICATION**

This is to certify that the undersigned Plaintiff Michael Kernell has reviewed this Complaint,

attested to its accuracy and by affixing his signature hereto adopts and ratifies the statements

herein as a true and accurate to the best of his knowledge, information, and belief.

STATE OF TENNESSEE

COUNTY OF SHELBY

    Before me appeared _Michael Kernell_ and affixed his signature hereto as an

attestation to the truth of the statements made herein.

Notary Public:

My Commission Expires:

3·16·21

## **VERIFICATION**

This is to certify that the undersigned Plaintiff Ann Scott has reviewed this Complaint, attested to

its accuracy and by affixing her signature hereto adopts and ratifies the statements herein as a

true and accurate to the best of her knowledge, information, and belief.

STATE OF TENNESSEE

COUNTY OF SHELBY

Before me appeared _Ann Scott_ and affixed his signature hereto as an

attestation to the truth of the statements made herein.

Notary Public:

My Commission Expires:

_3·16·21_



## **VERIFICATION**

This is to certify that the undersigned Plaintiff _Suh/Gara Yahueh_ has reviewed this

Complaint, attested to its accuracy and by affixing his signature hereto adopts and ratifies the

statements herein as a true and accurate to the best of his knowledge, information, and belief.

_Suhkara A Yahweh_

STATE OF TENNESSEE

COUNTY OF SHELBY

Before me appeared _Suhkara A. Yahweh_ and affixed his signature hereto as an

attestation to the truth of the statements made herein.

Notary Public:

My Commission Expires:

_08 - 10 - 2021_

## **VERIFICATION**

This is to certify that the undersigned Plaintiff _Joe Towns Jr_ has reviewed this

Complaint, attested to its accuracy and by affixing his signature hereto adopts and ratifies the

statements herein as a true and accurate to the best of his knowledge, information, and belief.

STATE OF TENNESSEE

COUNTY OF SHELBY

Before me appeared _Joe Towns, Jr_ and affixed his signature hereto as an

attestation to the truth of the statements made herein.

Notary Public;

My Commission Expires:

April 26, 2020