# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| SHELBY COUNTY ADVOCATES FOR VALID ELECTIONS, MICHAEL KERNELL, JOE TOWNS, JR., ANN SCOTT, and BRITNEY THORNTON, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 2:18-cv-02706-TLP-dkv |
| v. | ) ) | JURY DEMAND |
| TRE HARGETT, in his official capacity as TENNESSEE SECRETARY OF STATE, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

## ORDER GRANTING MOTIONS TO DISMISS WITHOUT PREJUDICE

Plaintiffs seek an order requiring Defendants to implement procedures Plaintiffs believe will make elections more secure and trustworthy.  (ECF No. 104.)  Now Defendants move to dismiss the complaint.  (ECF Nos. 115 & 116.)  The Court held a hearing on the Motions and heard arguments from the parties.  (*See* Minute Entry, ECF No. 137.)  The Motions are now ripe.  For the reasons below, the Motions to Dismiss are GRANTED.

## BACKGROUND

### I.      Prior Proceedings

Plaintiffs sued here on Friday, October 12, 2018, five days before early voting began in Shelby County, Tennessee for the November 2018 elections.  (ECF No. 1.)  The Complaint brings "a civil rights action for declaratory and injunctive relief" against the State of Tennessee, Shelby County, and various individuals responsible for conducting elections.

(ECF No. 104.)  Shortly after suing, Plaintiffs moved for a temporary restraining order ("TRO") and mandamus order requesting an order requiring the election officials take various affirmative measures related to the voting system before early voting began.  (ECF No. 23.)  The Court held a hearing on that request and heard from representatives for all parties.  The Court determined that Plaintiffs failed to meet their burden of proof and issued both an oral order denying the request for a TRO and entered a written oral elaborating on its reasons for denying the Motion.  (ECF No. 43.)

The case then continued.  Plaintiffs filed two amended complaints.  (ECF Nos. 63 & 104.)  The Second Amended Complaint is now the operative filing.  The Court will refer to the Second Amended Complaint simply as the Complaint.

## II.     General Allegations

The Complaint names various state and county officials charged with implementing election processes, as well as the Tennessee Election Commission ("Tennessee") and the Shelby County Election Commission ("Shelby County").[1]  (*See* ECF No. 104.)  Plaintiffs allege that both the State and County Defendants have created and maintained a non-functioning voting system that deprives Individual Plaintiffs and members of Shelby Advocates for Valid Elections ("SAVE") the fundamental right to vote and the equal protection of that right.  (ECF No. 104 at PageID 1197.)  Plaintiffs allege many deficiencies within the Shelby County election process that interfere with their right to vote.  But their

---

[1] The Court refers to Defendants at times as the State Defendants and the County Defendants. The State Defendants include Tre Hargett, Mark Goins, Kent D. Younce, Judy Blackburn, Greg Duckett, Donna Barrett, James H. Wallace, Jr., Tom Wheeler, Mike McDonald, and the Tennessee Election Commission.  And the County Defendants include Linda Phillips, Robert Meyers, Norma Lester, Dee Nollner, Steve Stamson, Anthony Tate, and the Shelby County Election Commission.

main issue is that Shelby County's use of AccuVote-TSx R7 direct-recording electronic

voting machines ("AccuVote DRE") and Diebold GEMS version 1.18.24.101 voting software

allegedly does not meet Tennessee statutory requirements and thus creates an inherently

insecure and inaccurate voting system.  (*See id*. at PageID 1198.)

In effect, Plaintiffs allege that Shelby County's voting system is not secure because it

does not create a voter verified paper audit trail ("VVPAT").  (ECF No. 104 at PageID 1198.)

The AccuVote DRE does not record each voter's selection on a paper ballot.  Instead, each

voter verifies their choices on the screen (much like using a banking ATM machine) before

submitting their ballot electronically.  And the machine stores their votes on removable

memory cards and on the voting machine's internal flash memory.  (*Id*. at PageID 1223–25.)

After the polls close on election day, poll workers insert the memory cards from each

DRE machine into one machine to tabulate the votes from that precinct.  (ECF No. 104 at

PageID 1223.)  Shelby County's practice is to bring these memory cards to centralized Zone

Turn-in Sites or directly to the election headquarters for tabulation.  (*Id*. at PageID 1224 &

1226.)  Election workers then upload these results to the Diebold GEMS server where the

software combines election-day data with mail-in absentee ballots to tabulate the election

results.  (*Id*. at PageID 1226.)  Another concern Plaintiffs have about the AccuVote DRE is

that it can connect to the internet and Shelby County election officials sometimes use this

capability to transfer election results from satellite turn-in locations to the election

headquarters.  (*Id*. at PageID 1260–61.)

Plaintiffs claim these alleged deficiencies in the voting process purportedly uniquely

affect Shelby County voters because of the County's size and racial makeup.  (ECF No. 104 at

PageID 1198–99.)  Plaintiffs allege that out of the 95 counties in Tennessee, Shelby County

has the largest African American population.  (*Id*. at PageID 1255.)  And no other county in Tennessee uses the same DRE voting machine that Shelby County uses.  (*Id*. at PageID 1256.)  That said, Plaintiffs acknowledge that only 14 of the 95 counties in Tennessee use a VVPAT capable voting system.  (*Id*. at PageID 1258.)  Chattanooga is the only major city in Tennessee that is in a county that uses a VVPAT system.  (*Id*. at PageID 1258–59.)

But counties using VVPAT voting systems must perform audits of the ballots cast in presidential and gubernatorial elections.  (*Id*. at PageID 1260); *see also* Tenn. Code Ann. § 2-20-103.  Plaintiffs argue that Shelby County's voting system is not subject to a meaningful recount or audit because the only record of the votes kept is on the AccuVote DRE's internal memory cards.  These cards, they assert, can be hacked or manipulated.  (*Id*. at PageID 1231.)  Plaintiffs point to systems elsewhere that include a VVPAT so the election officials verify the results.  These supposed weaknesses undergird Plaintiffs' theory that Shelby County's election procedures were "designed and implemented with the intent of disenfranchising Shelby County voters, the majority of whom are African American, including Plaintiffs Joe Town, Jr. and Britney Thornton."  (*Id*. at PageID 1232.)

Adding to their claims, Plaintiffs allege that Defendants do not properly train many of the election officials and poll workers to use the voting machines and software.  This, they claim, raises the likelihood of misconduct.  (ECF No. 104 at PageID 1227.)  The lack of training and oversight has reportedly led to the cavalier handling of memory cards from the AccuVote DRE machines.  (*Id*. at PageID 1238 & 1240.)  And the GEMS software has at times exhibited defective connections with the DRE memory cards.  (*Id*. at PageID 1245.)  Still another problem with the equipment is that sometimes a voter's selection of one candidate registers on the screen as a vote for that candidate's opponent.  (*Id*. at PageID 1247–

4

48.)  Plaintiffs thus allege that Shelby County's antiquated voting equipment paired with the ill-prepared election workers leaves Shelby County's election system vulnerable to undetectable hacking and malicious manipulation.  (*Id*. at PageID 1228.)

All in all, Plaintiff's claim that Shelby County's current voting system creates a fundamentally unfair voting system in violation of the Due Process Clause of the Fourteenth Amendment, and that it has impaired Shelby County voters' ability to participate in state elections on an equal basis with other qualified voters in Tennessee.  (ECF No. 104 at PageID 1264–65.)  This has caused vote dilution which violates the Equal Protection Clause of the Fourteenth Amendment.  (*Id*.)

## III.    Specific Allegations

### A.    Due process claim

Plaintiffs' due process claim hinges on their argument that the right to participate in a "trustworthy and verifiable election process that safely, accurately, and reliably records and counts all votes cast" is part in parcel with the fundamental right to vote.  (ECF No. 104 at PageID 1275.)  The voting systems used by Shelby County allegedly suffers from non-uniform standards and improperly trained personnel causing an unfair system and the denial of the right to vote.  (*Id*.)  Plaintiffs argue that such an unsecure voting system creates an unreasonable risk of votes being miscounted or that registered voters will be erroneously denied the right to vote.  (*Id*. at PageID 1277.)  Besides these risks, and to shoehorn its claim into a category recognized by Courts as a valid one, SAVE asserts that it must divert its resources, time, and personnel from other projects to monitor Shelby County's continued use of the AccuVote DRE voting machines.  (*Id*.)  Above all, SAVE argues it must keep taking legal action until the County uses hand-marked paper ballots.  (*Id*.)

Plaintiff Kernell also claims that when he ran for State Representative for District 93 in Shelby County in August 2012, election workers distributed around 720 incorrect ballots to voters.  (ECF No. 104 at PageID 1268.)  Poll workers gave ballots to some voters residing outside District 93 which allowed them to vote for or against Kernell.  (*Id*.)  He claims that he had to waste time and money campaigning for a race when Defendants did not adhere to district lines.  (*Id*. at PageID 1268–69.)  Kernell argues that he will have to expend additional sums of money and spend extra time reaching voters outside his district if he runs for office again.  (*Id*. at PageID 1270.)  And Plaintiff Kernell predicts that such issues with Shelby County's voting system will lead potential candidates to decline running for office.  (*Id*.) Plaintiffs Towns, Jr. and Thornton also believe that they will have to spend additional sums of money and time to reach voters outside of their districts to prevent the same issues from arising that burdened Kernell's candidacy seven years ago.  (*Id*.)

**B.     Equal protection claim**

Plaintiffs also allege that the continued use of the DRE voting machines creates an unequal voting system within Tennessee in violation of the Equal Protection Clause of the Fourteenth Amendment.  (ECF No. 104 at PageID 1281.)  This voting system allegedly dilutes the voting power within Shelby County and violates the right to have one's vote counted equally.  (*Id*.) And Plaintiffs claim this treatment has a disproportionate impact on Tennessee's African American population because Shelby County has the largest population of African American voters in the State.  (*Id*. at PageID 1282.)  As a result, the voting system implemented by Defendants brings about different treatment for Shelby County citizens because of where they reside.

IV.     **Requested Relief**

To remedy these issues, Plaintiffs seek an order declaring that Shelby County's voting system violates Plaintiffs' right to equal protection under the Fourteenth Amendment and their fundamental right to vote under the Due Process Clause of the Fourteenth Amendment.  (ECF No. 104 at PageID 1287.)  Plaintiffs demand that this Court order Defendants to replace the Shelby County voting systems with paper ballots and an optical scan system.  (*Id*. at PageID 1251.)  They also request that the Court order an examination and an internal audit of current software, vote tabulator, and voting machines.  (*Id*.)  They also seek an order enjoining Defendants from holding future elections without adopting and enforcing rules and regulations that ensure the safety and accuracy of the voting process.  (*Id*. at PageID 1288.)  That said, both the State Defendants and the County Defendants moved to dismiss the complaint arguing, among other things, that Plaintiffs lack standing to bring this complaint.  (ECF Nos. 115 & 116.)  The County Defendants have joined in the State Defendants' Motion and have also made arguments of their own.  (*See* ECF NO. 116.)  The Court addresses these Motions together where the arguments are the same.

## **LEGAL STANDARD**

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  To analyze a motion to dismiss under this Rule, the Court begins with the pleading requirements in Rule 8 of the Federal Rules of Civil Procedure. Under Rule 8, a complaint must contain "a short and plain statement showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In practice, Rule 8 requires that a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017).

Though a court will grant a motion to dismiss if a plaintiff has no plausible claim for relief, a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirecTV v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). "A complaint should only be dismissed if it is clear to the court that 'no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Herhold v. Green Tree Serv., LLC*, 608 F. App'x 328, 331 (6th Cir. 2015) (quoting *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 855 (6th Cir. 2003)). "Dismissal of the action is proper if there is an absence of law to support the type of claim made, if the facts alleged are insufficient to state a valid claim, or if, on the face of the complaint, there is an insurmountable bar to relief." *Doe v. Ohio*, No. 2:91-CV-464, 2012 WL 12985973, at *5 (S.D. Ohio Feb. 16, 2012) (citations omitted).

Additionally, a party may move to dismiss the claims for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). A motion made under this Rule involves a different analysis. This is so because a Rule 12(b)(1) motion challenges a federal courts authority to decide a case, while a Rule 12(b)(6) motion tests whether the plaintiff has pleaded a cognizable claim. *Primax Recovers, Inc. v. Gunter*, 433 F.3d 515, 517 (6th Cir. 2006) (quoting 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350 (3d ed. 2004)). One instance in which subject-matter jurisdiction is absent is when a plaintiff cannot meet the standing requirements of Article III of the United States Constitution. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). The case or controversy mandate of Article III endows the standing doctrine. *See* U.S. Const. art. III, § 2.

The standing doctrine includes three elements and the plaintiff bears the burden of establishing each element. *Spokeo*, 136 S. Ct. at 1547.   The plaintiff must show: (1) that she suffered an injury in fact; (2) that the injury is fairly traceable to the conduct of the defendant; and (3) that the injury is likely to be redressed by a favorable decision by the court. *Id*. (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).   Put another way, an injury in fact is one that is both "concrete and particularized." *Spokeo*, 136 S. Ct. at 1548-49.   A concrete injury must truly exist. (*Id.*)   And a particularized injury "must affect the plaintiff in a personal way." (*Id.*)   "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element.'" *Id*. (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).   Each claim is subject to dismissal if a plaintiff lacks standing to assert it.

## ANALYSIS

Defendants' main argument for dismissal is that Plaintiffs lack standing to sue here. (ECF No. 115-1 at PageID 1551.)   To that end, Defendants argue that Plaintiffs have failed to plead an injury in fact. (*Id*. at PageID 1553.)

"Article III standing is 'the threshold question in every federal case[.]'" *Davis v. Detroit Public Sch. Cmty. Dist.*, 899 F.3d 437, 443 (6th Cir. 2018) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)) (alteration in original).

Because Plaintiffs ground their claims for injunctive relief on the same arguments they have for declaratory relief—that the current voting system is unlawfully deficient—the Court may dismiss claims of any Plaintiff who lacks standing for declaratory relief here. *See Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 652 (6th Cir. 2007). For a court to grant declaratory relief, the plaintiff must allege or "demonstrate actual present harm or a

significant possibility of future harm." *Fieger v. Ferry*, 471 F.3d 637, 643 (6th Cir. 2006).  In

*Clapper v. Amnesty Int'l USA*, the Supreme Court noted its longstanding requirement "that

threatened injury must be *clearly impending* to constitute injury in fact, and that allegations of

*possible* future injury are not sufficient."  13 S. Ct. 1138, 1147.

Taking each Plaintiff one at a time, the Court will determine whether they have

standing to bring the claim for declaratory relief.

## I.      Plaintiff SAVE

SAVE is a nonprofit corporation based in Memphis and whose membership includes

individuals residing in Tennessee.  (ECF No. 104 at PageID 1203.)  SAVE's purpose is to

monitor public elections and report those findings to the public.  (*Id*.)  And SAVE advocates

for more secure and reliable election processes by submitting their reports to governmental

bodies.  (*Id*.)

An organization such as SAVE can establish standing two ways.  First, the

organization may assert standing "on its own behalf because it has suffered a palpable injury

as a result of the defendants' actions" through so-called organizational standing.  *MX Group,*

*Inc. v. City of Covington*, 293 F.3d 326, 332–33 (6th Cir. 2002) (citing *Warth*, 422 U.S. at

511).  Second, an organization may claim standing as a representative of its members who

would have standing to sue individually through associational standing.  *Id*.

### A.      Organizational Standing

To establish organizational standing, a plaintiff organization must establish the three

traditional elements of standing.  *See Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th

Cir. 2014).  That is, the organization must establish that it suffered an injury in fact, that the

injury is fairly traceable to the conduct of the defendant and that the injury can be remedied by

a favorable decision. *Id*. But plaintiffs seeking injunctive or declaratory relief face a higher

burden. *Id*. at 460 ("[Plaintiffs who have standing to bring a damages claim do not

necessarily have standing to bring a claim for" injunctive or declaratory relief.) On top of the

*Lujan* elements, "plaintiffs seeking injunctive or declaratory relief must show 'actual present

harm or a significant possibility of future harm.'" *Vaduva v. City of Xenia*, 2019 WL

3714790, at *6 (6th Cir. Aug. 7, 2019) (quoting *Grendell v. Ohio Supreme Ct.*, 252 F.3d 828,

833 (6th Cir. 2001)).

SAVE argues that it has organizational standing because its mission has been

frustrated by the lack of secure voting systems and it will continue to be, "harmed by the

diversion of resources from its purposes of research and education in order to bring, fund, and

participate in this litigation." (ECF No. 104 at PageID 1265.) Defendants argue that

Plaintiff's diversion of resources theory of harm is not enough to establish an injury in fact

here. (ECF No. 115-1 at PageID 1553.) Going on, Defendants point out that an organization

lacks standing if it "'manufacture(s) the injury by incurring litigation costs or simply

choos[es] to spend money fixing a problem that would otherwise not affect the organization at

all. It must instead show that it would have suffered some other injury if it had not diverted

resources to counteracting the problem.'" Citing *Valle del Sol, Inc. v. Whiting*, 703 F.3d

1006, 1018 (9th Cir. 2013.) So the diversion of resources theory is at issue.

Addressing this theory in *Sierra Club v. Morton,* the Supreme Court noted that an

organization's abstract interest in a problem cannot establish standing, "no matter how

longstanding the interest and no matter how qualified the organization is in evaluating the

problem." 405 U.S. 727, 739, 92 S. Ct. 1361 (1972). Looking at standing, "an organization's

abstract concern with a subject that could be affected by an adjudication does not substitute

for the concrete injury required by Art. III." *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 40, 96 S. Ct. 1917 (1976). By extension, if an organization "seek(s) to do no more than vindicate their own value preferences through the judicial process" that organization generally cannot establish standing. *Sierra Club,* 405 U.S. at 740, 92 S. Ct. 1361; *see also Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S. Ct. 1114(1982).

The Sixth Circuit has addressed the diversion of resources theory of injury in fact several times. In *Fair Elections Ohio v. Husted*, the court held that an organization conducting voter outreach programs lacked standing to sue to overturn an Ohio incarceration practice that prevented individuals jailed at certain times from voting, because the organization had only "abstract social interest in maximizing voter turnout" instead of a concrete stake in voter registration. 770 F.3d at 461. The Sixth Circuit found that the organization had not suffered an injury in fact just because it expended resources advising others how to comply with a law or attempting to change the law. *Id*. at 460. The court summed up its opinion by stating "the law purportedly injures [the organization] by hampering [its] abstract social interest in maximizing voter turnout. Harm to abstract social interests cannot confer Article III standing." *Id*. at 460.

On the other hand, in *Northeast Ohio Coalition for the Homeless v. Husted*, the Sixth Circuit held that the plaintiff organization established standing. 837 F.3d 612, 624 (6th Cir. 2016). The plaintiff had standing there because it had immediate plans to revise its voter education program to change from assisting the homeless with mail-in voting to focus on helping the homeless participate in early, in-person voting in response to changed election laws. *Id.* The court found that this change in the organization's conduct was a complete "overhaul" of the organization's strategy—more than just effort and expense associated with

advising voters how to follow the law as in *Fair Elections Ohio v. Husted*. *Id*. The Sixth Circuit held that the organization's "allegations indicate that the burden would cause them to change significantly their expenditures and operation and a favorable decision would redress that injury . . . ." *Id*.

SAVE relies on *Galaria v. Nationwide Mutual Insurance Company*, 663 F. App'x 384 (6th Cir. 2016), to support its argument that costs incurred to mitigate the perceived threats posed by the AccuVote DREs satisfies the standing requirements. (*See* ECF No. 128 at PageID 1647–48.) In that case, the plaintiffs brought a class action against the defendant after computer hackers breached the defendant's network and stole the plaintiffs' personal information. *Galaria*, 663 F. App'x at 385. The Sixth Circuit held that the plaintiffs established a cognizable Article III injury because they had alleged a substantial risk of harm and had shown that they reasonably incurred mitigation costs. *Id*. at 388. In fact, the plaintiffs alleged that an unknown party had stolen their private information and that they had a continuing, increasing risk of fraud and identity theft. *Id*.

Here, SAVE has established no significant risk of harm like the plaintiffs in *Galaria*. SAVE, and the other Plaintiffs, allege that the AccuVote DRE machines are subject to hacking or manipulation, but they have no citations in the record showing that anyone has hacked or manipulated Shelby County's voting machines[2]. This is different than *Galaria* where the plaintiffs established that someone had stolen their information and that the risk of future harm had substantially increased, causing them to incur mitigation expenses. Plaintiffs' allegations here are based only on speculation, conjecture and their seemingly sincere desire

---

[2] To be sure, in this digital age, hacking is a possibility. But courts require more than a possibility to maintain an action for injunctive relief.

for their "own value preferences" in having voting machines with a paper trail. As a result, Plaintiffs fail to establish substantial risk of harm.

This also differs from the increased risk of harm in *Stewart v. Blackwell*, 444 F.3d 843, 849 (6th Cir. 2006), *vacated as moot*, 473 F.3d 692 (6th Cir. 2007), where statistical evidence showed that the error rate was 50 percent higher in voting machines using punch cards versus other voting technologies. In that case, the Sixth Circuit held that the plaintiffs had established, beyond speculation, the increased probability that the punch-card system was more likely to count votes improperly. *Id*. at 855. In contrast, as noted above, SAVE's alleged risk of harm is based on fear and speculation that AccuVote DRE is likely to count votes improperly in upcoming elections. Although Plaintiffs raise several possible flaws with AccuVote DRE, they have provided no evidence that there is a realistic possibility that upcoming elections will be compromised. And merely alleging that issues arising during the 2012 election will recur with no real proof of that likelihood is the sort of hypothetical harm on which this Court cannot grant relief. Plaintiffs allege no facts showing that AccuVote DRE systems miscount votes or are more likely to miscount votes when compared to other voting systems. SAVE therefore has not established a substantial risk of harm to its members.

And SAVE has not established that its diversion of resources to fund this litigation establishes a cognizable Article III injury. SAVE's purpose is to monitor elections, report its findings, and advocate for more secure election processes. (ECF No. 104 at PageID 1203.) "Harm to abstract social interests cannot confer Article III standing." *Fair Elections Ohio*, 770 F.3d at 460. That SAVE is having to spend more to advocate their position does not satisfy the injury in fact standard. SAVE's "diversion of resources" is unlike those in *Northeast Ohio Coalition for the Homeless v. Husted*. The plaintiff in that case had to change

their organizational tactics to keep helping the homeless community vote.  By contrast SAVE has decided to institute this lawsuit to advocate proactively for a change in Shelby County's voting process to what it perceives to be safer elections.

It is true that funding this lawsuit may divert funds from SAVE's other goals.  But that is a cost that SAVE has chosen to incur to further its abstract social interest of having more secure elections.  SAVE has therefore not established that it suffered an injury in fact and lacks organizational standing to sue here.  The Court will now determine whether SAVE has associational standing.

### B.    Associational Standing

SAVE's remaining option to establish standing is to sue as a representative of its members who would have standing to sue individually through associational standing. *MX Group, Inc.*, 293 F.3d at 332–33.  "An association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim requested nor the relief requested requires the participation of individual members in the lawsuit."  *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 254–55 (6th Cir. 2018) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000)).

Defendants argue that SAVE cannot meet the third element for associational standing––that the participation of the individual members in the lawsuit is not required.  (ECF No. 115-1 at PageID 1556.)  Defendants argue that the individual members' participation is required because SAVE does not have the right to vote and it must therefore establish that one of its members is a registered voter and has suffered an injury in fact as a result of the current

15

voting system used in Shelby County. (*Id.*) To be sure, SAVE must show that one of its members has the right to vote and would be harmed by using the current voting system, this does not necessarily require a member's participation. Defendant's argument does not hold water because "[t]he individual participation of an organization's members is 'not normally necessary when an association seeks prospective or injunctive relief for its members.'" *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) (quoting *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996)).

That said, SAVE still must establish that "at least one of [its] members would have standing to sue on his own." *Waskul*, 900 F.3d at 255 (citation omitted) (alteration in original). This means that the organization "must show that one of its named members '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). This requires a specific allegation of the name of the member harmed unless all members of the organization have been harmed by the defendant's conduct. *Tennessee Republican Party v. Sec. and Exch. Comm'n*, 863 F.3d 507, 520 (6th Cir. 2017) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)). The Court focuses on whether any of SAVE's members have suffered an injury in fact.

An injury in fact is a "concrete and particularized" and "actual or imminent, not conjectural or hypothetical" harm caused by the invasion of a legally protected interest. *Tennessee Republican Party*, 863 F.3d at 517 (quoting *Spokeo, Inc.*, 136 S. Ct. at 1548). A harm is a particularized one if it affects a plaintiff in a "personal and individual way . . . ."

*Davis*, 899 F.3d at 444.  And it is concrete if it "actually exist[s]."  *Duncan v. Muzyn*, 885

F.3d 422, 427 (6th Cir. 2018) (quoting *Spokeo, Inc.*, 136 S. Ct. at 1548).

> i.     **SAVE alleges that at least one of its members has suffered an Article III injury.**

The Complaint identifies only Carol Chumney, Michael Kernell, and Dr. Joseph

Weinberg as members of SAVE.  (ECF No. 104 at PageID 1203.)  Of that group, Michael

Kernell is the lone member to allege that he suffered a constitutional injury.  (*Id*. at PageID

1205.)  Kernell alleges harm when he ran in the 2012 August county and state primaries.

During that 2012 primary election, Shelby County election officials allegedly issued the

wrong ballot to thousands of voters which caused about 720 voters to cast ballots in the wrong

precinct.  (*Id*. at PageID 1205–06.)

Kernell also alleges that, in August 2018, he ran as a candidate for the Shelby County

School Board of Commissioners and that "before certification, he repeatedly called the

Defendant Shelby County Election Commission to obtain certified copies of the poll tapes for

his district as allowed by state law, and was never timely afforded an opportunity to do so."

(*Id*. at PageID 1206.)  And Kernell states that he observed Shelby County election workers in

November 2018 failing to adhere to state election rules regulating uploading votes after polls

are closed on election day.  (*Id*.)  Kernell claims that these "improprieties" provide "a

reasonable basis that, absent injunctive relief, he will be disenfranchised or severely burdened

in exercising his fundamental right to vote in future elections . . . ."  (*Id*. at PageID 1206–07.)

SAVE also claims that all its members are "threatened with imminent injury-in-fact . .

. ."  (ECF No. 104 at PageID 1204.)  SAVE alleges that Defendants' actions "have infringed

on their fundamental right to vote and to equal protection"  due to the unsecure voting system

used by Shelby County. (*Id.* at PageID 1204, 1266.) Thus SAVE argues that at least one of its members has suffered an Article III injury.

### ii.     SAVE's allegations are only generalized grievances.

SAVE's allegations amount to a general dissatisfaction with the voting system and processes used in Shelby County. SAVE wants a more secure voting system with a paper trail and it is suing to get it. While SAVE's aspiration makes sense, its absence—that is, the current voting system—has not caused "concrete and particularized harm." Wanting a better, more secure voting system, will likely always be SAVE's desire. That is, until someone devises the illusive perfect voting system. SAVE is out to vindicate its own value preferences and it boils down to general dissatisfaction.

"[A] plaintiff raising only a generally available grievance about government— claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Davis*, 899 F.3d at 444 (quoting *Lujan*, 504 U.S. at 573–74.) So-called general grievances do not meet the Article III standing requirements because such "harms" fail to affect the plaintiff in a "personal and individual way." *Id.* (quoting *Spokeo, Inc.*, 136 S. Ct. at 1548.)

Alleging that the AccuVote DRE used by all voters in Shelby County violates legally protectable interests, SAVE has identified an issue that affects all voters in Shelby County equally. This type of generalized grievance is simply not enough to meet the Article III standing requirements. *See, e.g.*, *Davis*, 899 F.3d at 444 (holding that Plaintiffs did not state any more than a generalized grievance where they could not prove they were affected in a "personal and individual way" and where the challenged ballot question "affect[ed] all Detroit

voters equally"); *Lujan*, 504 U.S. at 555 ("[A] plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy").  SAVE, then, has failed to provide the Court with any evidence that any of its members would suffer from a special harm that makes the injury particularized to SAVE members.  And suing the Shelby County Election Commission to force it to abide by the rules and regulations that govern the election process in Tennessee and Shelby County suffers from the same defect.

The closest SAVE comes to a specific allegation of harm against one its members is the allegation that Defendants gave voters the wrong ballot when Michael Kernell was running for office in 2012.  But this too fails to meet the Article III injury standard.  "Past injury is also inadequate to constitute an injury in fact when the plaintiff seeks injunctive relief but [does not] suffer 'any continuing present adverse effects.'"  *Crawford v. United States Dep't. of Treasury*, 868 F.3d 438, 455 (6th Cir. 2017) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).  So while Kernell may have been harmed in 2012 when the election officials distributed the wrong ballots to voters, there is no proof that this will happen again.  SAVE and Kernel only hypothesize that it will.  Because SAVE seeks declaratory and injunctive relief, it would have to show that there is a realistic likelihood of the conduct reoccurring.  *See Lyons*, 461 U.S. at 105–06 (holding that the plaintiff failed to allege that a realistic possibility existed that he would face an illegal chokehold again in the future).  Kernell thus does not allege a cognizable injury because he has not shown that there is a real and immediate threat that Defendants will distribute wrong ballots in the future.

And so SAVE has failed to allege that at least one of its members has suffered an injury in fact. SAVE thus lacks associational standing to bring a claim for declaratory relief here. In the end, SAVE's claims for injunctive relief depend on its claims for declaratory relief. These claims are consequently dismissed because of SAVE's lack of standing. *See American Civil Liberties Union*, 493 F.3d at 652 ("The injunction in this case is predicated on the declaratory judgment . . . so it follows that if the plaintiffs lack standing to litigate their declaratory judgment claim, they must also lack standing to pursue an injunction.")

The Court now determines whether any of the remaining named Plaintiffs have standing to pursue these claims.

## II.    Joe Towns, Jr. and Britney Thornton

Neither Joe Towns, Jr. nor Britney Thornton allege that they have suffered an injury or are subject to an imminent injury. Instead, both Plaintiffs allege that they have a "reasonable basis to believe that, absent injunctive relief, [they] will be disenfranchised or severely burdened in exercising [their] fundamental right to vote" because of the "overwhelming probability" that Defendants will miscount votes in the future. (ECF No. 104 at PageID 1207–08.) Both Plaintiffs state their intention to run as candidates in future elections. (*Id.*) These beliefs stem from Defendants' use of the allegedly antiquated AccuVote DRE voting machines and allegedly ill-trained poll workers.

Despite Plaintiffs' fears, these allegations fall far short of being concrete injuries. As noted above, a concrete injury is one that is real and actually exists. *Spokeo, Inc.*, 136 S. Ct. at 1548. Future harm must be imminent, meaning "certainly impending," rather than a simple "allegation[] of possible future injury." *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 710 (6th Cir. 2015). The harm alleged here by Towns and Thornton is merely hypothetical.

20

Even construing the allegations in the light most favorable to them, Plaintiffs offer no proof showing that Shelby County's voting system is any more likely to miscount votes than any other system used in Tennessee.  At the same time, they have no proof that the AccuVote DRE voting machines are more likely to be hacked or manipulated than other Tennessee voting machines.  In sum, these allegations fall far short of the evidence provided in *Stewart* where statistical evidence showed that voting systems using punch-card ballot had a 50 percent higher likelihood of being miscounted than other voting technologies.  *See* 444 F.3d at 849.  Such a conjectural and hypothetical injury cannot survive as the foundation for Plaintiffs' claims.  *Tennessee Republican Party*, 863 F.3d at 517 (citing *Spokeo, Inc.*, 136 S. Ct. at 1548).

And so Towns and Thornton have failed to allege a concrete injury necessary to support standing on their declaratory judgment claim.  The Court finds that Towns and Thornton lack standing to bring these declaratory judgment claims and so the claims are dismissed.  These Plaintiffs' injunctive relief claims are also dismissed for the reasons stated above.

## III.    Ann Scott

The Complaint fails to allege that Ann Scott suffered a particularized harm.  Her claims arise solely out of her membership in SAVE.  In fact, beyond the general allegation that the AccuVote DRE machines may miscount her vote in future elections, the Complaint wholly fails to make any specific claims of harm as to Scott.  (*See* ECF No. 104 at PageID 1207–08.)  Scott's claims therefore amount to only generalized grievances that affect her no more than any other registered voter in the community at large.  Generalized grievances do

21

not support Article III standing.  *See Davis*, 899 F.3d at 444.  Scott's claims are therefore dismissed for lack of standing.

## IV.    Michael Kernell

Michael Kernell's allegations of harm were discussed before.  *See supra* Section I.B.i. And as stated above, Kernell's *allegation* that Defendants may distribute the wrong ballots in future elections fails to state a realistic likelihood that this harm is likely to repeat itself.  *See supra* Section I.B.ii.  This is necessary for cases seeking injunctive relief.  *See Lyons*, 461 U.S. at 105–06.  And the remaining claims are no more than generalized grievances that do not state a particularized harm.  So Kernell's claims are also dismissed.

## CONCLUSION

In the end, "[t]he law of Article III standing . . . serves to prevent the judicial process from being used to usurp the powers of the political branches . . . ."  *Spokeo, Inc.*, 136 S. Ct. at 1547 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 393, 408 (2013)).  Although initiatives designed to make election processes more secure are beneficial to the democratic process, this Court must limit its adjudicative power to "cases" and "controversies" as outlined in Article III.  No Plaintiff here has standing to bring the claims alleged, and so the Court is without the authority to hear this case.[3]  The Court, therefore, GRANTS the Motions to Dismiss without prejudice.

**SO ORDERED**, this 13th day of September, 2019.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE

---

[3] Defendants made several other arguments attacking the Second Amended Complaint here beyond their contention that Plaintiffs lack standing.  Yet given the Court's holding that Plaintiffs lack standing to bring the claims alleged, it is unnecessary to address the other arguments raised by Defendants.